*Estefany Martinez v. Amazon.com Services LLC*, Misc. No. 17, September Term, 2024. Opinion by Biran, J.

**LABOR AND EMPLOYMENT – MARYLAND WAGE AND HOUR LAW & MARYLAND WAGE PAYMENT AND COLLECTION LAW** – The Supreme Court of Maryland held that the doctrine of *de minimis non curat lex*, as described in *Anderson v. Mt. Clemens Pottery Company*, 328 U.S. 680 (1946), applies to claims brought under the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. ("LE") § 3-401 *et seq.* (1991, 2016 Repl. Vol.), and the Maryland Wage Payment and Collection Law, LE § 3-501 *et seq.*

United States District Court for the District of Maryland
Case No.: 22-00502-BAH
Argued: March 4, 2025

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 17

September Term, 2024

---

ESTEFANY MARTINEZ

v.

AMAZON.COM SERVICES LLC

---

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

---

Opinion by Biran, J.
Watts and Eaves, JJ., dissent.

---

Filed: July 3, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

By statute, this Court is authorized to "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 12-603 (1974, 2020 Repl. Vol., 2024 Supp.). The United States District Court for the District of Maryland has certified the following question to this Court:

> Does the doctrine of *de minimis non curat lex*, as described in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) and *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), apply to claims brought under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law?

The phrase "*de minimis non curat lex*" – often referred to as the "de minimis doctrine" or the "de minimis rule" – is an "age-old maxim" that has been translated as "the law doth not regard trifles."[1] As we explain below, the de minimis doctrine applies to claims brought under the Maryland Wage Payment Collection Law and the Maryland Wage and Hour Law.

## I

## Background

Under CJP § 12-605(a), "[t]he court certifying a question of law" to this Court "shall issue a certification order[.]" The certification order must contain "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]"

---

[1] Max L. Veech & Charles R. Moon, *De Minimis Non Curat Lex*, 45 MICH. L. REV. 537, 537-38 (1947) (quoting THOMAS BRANCH, PRINCIPIA LEGIS ET AEQUITATIS 36 (1st Am. ed. 1824)).

*Id.* § 12-606(a)(2). This Court accepts the facts provided by the certifying court. *See, e.g.,* *Price v. Murdy*, 462 Md. 145, 147 (2018). Thus, we adopt the following facts set forth in the certification order of the district court:

Plaintiff Estefany Martinez is a former Amazon.com Services LLC ("Amazon") employee who worked as a Fulfillment Associate between June 20, 2017, and November 12, 2021, at the Baltimore Fulfillment Center ("BWI2"). Specifically, Ms. Martinez worked as "packer" on the facility floor, where she sealed boxes and put them on a conveyor belt. Up until April 2020, Ms. Martinez and most other hourly Maryland fulfillment center employees were required to clock out at the end of the day before beginning the required post-shift security screening process.

### Lockers and Storage Area

Amazon employees arriving to begin their shift had the option to store their personal belongings in lockers before entering the secured area of the fulfillment floor. Ms. Martinez did not use a locker because she did not "know how to use it."

Employees had the option to not use the lockers and instead to carry their personal items onto the warehouse floor. Ms. Martinez chose to bring a backpack into the work area. Amazon did not require any personal items for work in the secured area, so no personal items were necessary for work functions.

### The Security Screening Process

From November 2018 through April 2020, employees who exited fulfillment centers passed through a security area on their way out of the building. Ms. Martinez's work location, BWI2, had two exits, an east and west exit. Ms. Martinez usually used the

east exit. Security screening at each of BWI2's exits consisted of metal detectors arranged in a row. Employees clocked out before passing through the security screening areas at BWI2 (and at the two other Amazon facilities at issue in the case), and thus were not compensated for the time spent in the screening areas.

Employees had three options for passing through the metal detectors, depending upon the items on their person. They could travel through: (1) an "express lane," which employees could use if they chose not to bring any items onto the floor that would trigger the metal detector; (2) a "divestment lane," where employees could slide items that would trigger the metal detector down a table for visual inspection and then pass through the metal detector; and (3) a "bag scan lane," where employees could place a bag on a conveyor belt and have it scanned while the employee walked through the metal detector.

A line would form in the bag-check lanes because the x-ray device in that lane had the capacity to process one bin containing one bag at a time. According to Ms. Martinez, there were sometimes approximately 20 people in line ahead of her in the bag-check lane.

Whether and to what extent a line would form in the divestment lane or the express lane is unclear. Ms. Martinez testified that "even in the express lane, there would be several people lined up." Geoffrey Gilbert-Differ (Senior Regional Loss Prevention Manager) indicated that he only observed lines accrue in the bag-check lanes with x-ray devices.

Ms. Martinez never used the express lane. She occasionally used the divestment lane when she did not have her bag. According to Ms. Martinez, if someone set off the metal detector, that person would then be subjected to secondary screening with a magnetic wand. Ms. Martinez testified that she triggered the metal detector "about twice" and that

3

someone from security waved a metal detector wand in front of her and behind her for "maybe three" seconds as part of the secondary screening. To cut down on the need for secondary screenings, all employees were instructed not to bring metal into the secured area to the extent possible.

*Time Punch Data Comparisons to Exit Swipe Data*

There is no way to definitively know how long employees waited in line. However, Amazon did collect two forms of time-related data: "time clock punch data" and "exit swipe data," which may permit some inferences. "Time clock punch data" reflects the time at which the employee finished their shift and clocked out at a time clock within the secured area. "Exit swipe data" refers to the time at which the employee swiped their badge at a turnstile in order to exit the facility after completing security.

The difference between the punch time and exit swipe does not necessarily capture the time the employee spent waiting in a security line. This is the case because if, on any given day an employee conducted any other activities after punching out at a time clock – such as using the restroom, going to the employee's locker, visiting a break room, or chatting with another employee, etc. – then the difference between the employee's clock out time and exit swipe time would not, according to Amazon, provide an accurate measurement of the time the employee spent waiting in a security line. Additionally, even if the employee went straight from security to the exit turnstile, the difference between clock out and exit swipe time would still exceed the time spent passing through security because that difference would also include the employee's time spent walking to an exit turnstile.

4

Amazon provided this time clock and exit swipe data to Peter Nickerson, an economist at Nickerson & Associates, LLC, a consulting firm specializing in economic and statistical analysis.[2] Mr. Nickerson determined that Ms. Martinez worked a total of 68 shifts during the relevant period of time. Mr. Nickerson provided an analysis of 65 of those 68 shifts. For 20 of those shifts (29.4% of shifts), it took three minutes or less after clocking out for Ms. Martinez to exit the facility through the exit turnstile. For 28 of the remaining 48 shifts (41.2% of shifts), she took between three to five minutes from clocking out to reach the exit turnstile. For 11 of the remaining 20 shifts (16.2% of shifts), Ms. Martinez took between five and eight minutes to exit after clocking out. For six shifts (8.8% of shifts), Ms. Martinez took 15 minutes or more to exit after clocking out.

In total, it took Ms. Martinez more than five minutes to exit after clocking out on 20 occasions. During these 20 shifts, a different employee punching out within one minute of Ms. Martinez, and at the same time clock, made it to the exit turnstiles in three minutes or less on at least 214 occasions. Amazon alleges that this "data undercuts any claim by [Ms. Martinez] that there were delays going through security."

Ms. Martinez's counsel retained Liesl Fox, a Senior Consultant and Partner at Quantitative Research Associates, to create "a damages model and report for [Ms. Martinez] that calculates the value of the wages associated with the time between when she stopped getting paid each day and when she swiped out to exit the facility after completing

---

[2] Amazon provided Mr. Nickerson with 947,800 rows of "time clock punch data" and 1,235,356 rows of "exit swipe data" for the period of December 1, 2018, through May 21, 2019.

the post-shift security screening process." Based on the data provided, Ms. Fox concluded that Ms. Martinez "experienced a total 9.61 Paid-to-Exit Time Lag hours during the period from November 18, 2018 through May 20, 2019, of which 1.95 exceeded the 40-hour per week overtime threshold" and thus Ms. Martinez "would be owed a total of $161.65."

## II

## Procedural History

Ms. Martinez filed suit against Amazon on December 2, 2021, on behalf of herself and a putative class in the Circuit Court for Baltimore City. Amazon removed the case to federal court. The district court stayed the case pending the outcomes of two cases in this Court: *Amaya v. DGS Construction, LLC*, No. 14, Sept. Term, 2021, and *Rojas v. F.R. General Contractors, Inc.*, No. 17, Sept. Term, 2021. Those cases were decided in a single opinion issued in July 2022. *See Amaya v. DGS Construction, LLC*, 479 Md. 515 (2022). Thereafter, the stay in this case was lifted, Amazon filed an Answer, and the parties engaged in discovery. Ms. Martinez subsequently filed a Motion for Class Certification, and Amazon filed a Motion for Summary Judgment.

On November 18, 2024, the district court granted Ms. Martinez's Motion for Class Certification. In the same order, the district court certified to this Court the question of law that is presently before us. The district court stated in its order that "[o]nce the certified question is resolved, existing authority will provide the Court with adequate guidance to resolve [Amazon's] pending motion for summary judgment."

## III

## Standard of Review

When answering a certified question of law, this Court determines only questions of Maryland law, not questions of fact. *United Bank v. Buckingham*, 472 Md. 407, 421 (2021); *Fangman v. Genuine Title, LLC*, 447 Md. 681, 690 (2016). "[W]e may go no further than the question certified." *Dickson v. United States*, 478 Md. 255, 260 (2022) (internal quotation marks and citations omitted). Our analysis necessarily is *de novo*.

## IV

## Analysis

### A. Pertinent Authority

We begin by summarizing the key statutes, regulations, and Court decisions that the parties have cited as informing our analysis of the certified question.

*The Fair Labor Standards Act of 1938*

Congress passed the Fair Labor Standards Act of 1938 (the "FLSA") "to correct and as rapidly as practicable to eliminate" "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers[.]" 29 U.S.C. § 202. To remedy such conditions, the FLSA sets forth minimum wage standards, overtime compensation protections, and child labor prohibitions. *See id.* §§ 206, 207, 212. "[T]he purpose behind the FLSA is to establish a national floor under which wage protections cannot drop[.]" *Pacific Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990) (emphasis omitted).

With respect to wages, Congress provided in the FLSA that "[e]very employer shall pay to each of his employees" a minimum "wage[]" for each "hour" worked. 52 Stat. 1062-63, § 6(a) (1938), *codified at* 29 U.S.C. § 206(a). As for overtime, the FLSA requires employers to pay "not less than one and one-half times the regular rate" for time worked over 40 hours in a "workweek." 52 Stat. 1063, § 7(a), *codified at* 29 U.S.C. § 207(a). The FLSA does not define "work" or "workweek."

*Anderson v. Mt. Clemens Pottery Company*

In a series of cases in the 1940s, the United States Supreme Court "sought to define 'work' for purposes of the FLSA." *Amaya*, 479 Md. at 543. One of those cases was *Anderson v. Mt. Clemens Pottery Company*, 328 U.S. 680 (1946).[3] There, the employer

---

[3] The other two decisions in this early line of Supreme Court FLSA cases were *Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123*, 321 U.S. 590 (1944), and *Armour & Company v. Wantock*, 323 U.S. 126 (1944). In *Tennessee Coal*, the Court addressed the issue of "what constitutes work or employment in underground iron ore mines within the meaning of the [FLSA]," and, in particular, whether time spent by miners traveling underground in mines to and from the locations where they drilled and loaded ore "constitute[d] work or employment for which compensation must be paid under the [FLSA]." 321 U.S. at 591-92. The Court held that work or employment had the common meaning of "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598.

In *Armour*, the Supreme Court considered whether an employer was required to pay overtime to employees for time they "spent on the employer's premises as fire guards subject to call, but otherwise put to such personal use as sleeping or recreation." 323 U.S. at 127. The fire guards generally were not permitted to leave the premises during this "personal use" time. *See id.* at 128. Observing that "[r]eadiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer," the Court held that the FLSA "does not exclude as working time periods contracted for and spent on duty … merely because the nature of the duty left time hanging heavy on the employees' hands[.]" *Id.* at 133, 134.

8

required employees to punch in at time clocks (which took some employees at least eight minutes, given the volume of employees and the number of clocks) and then walk to their respective places of work and prepare for the start of productive work by putting on aprons and overalls, taping or greasing their arms, preparing equipment for use, etc. *Id.* at 682-83. Employees were allowed 14 minutes to get from the plant entrance to their workplaces and prepare for the start of productive work, and they were similarly allowed 14 minutes at the conclusion of productive work to punch out at the time clocks and leave the plant. *Id.*

The company did not pay the employees for all time they were clocked in at the plant. Rather, the company paid the employees based on "time extend[ing] from the succeeding even quarter hour after employees punch in to the quarter hour immediately preceding the time when they punch out." *Id.* at 683. Thus, as the Court explained,

> an employee who punches in at 6:46 a.m., punches out at 12:14 p.m., punches in again at 12:46 p.m. and finally punches out at 4:14 p.m. is credited with having worked the 8 hours between 7 a.m. and 12 noon and between 1 p.m. and 4 p.m. – a total of 56 minutes less than the time recorded by the time clocks.

*Id.* at 683-84.

Employees brought an action under the FLSA alleging that the method of calculation did not accurately reflect the time actually worked and that they were thereby deprived of overtime compensation guaranteed to them by the FLSA. *Id.* at 684. The Court determined the employees had proved "that it was necessary for them to be on the premises for some time prior and subsequent to the scheduled working hours." *Id.* at 690. The Court explained:

The employer required them to punch in, walk to their work benches and perform preliminary duties during the 14-minute periods preceding productive work; the same activities in reverse occurred in the 14-minute periods subsequent to the completion of productive work. Since the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace, the time spent in these activities must be accorded appropriate compensation.

*Id.* at 690-91. Thus, the Court gave "workweek," as used in the FLSA, a judicially defined meaning: it includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace[.]" *Id.*

However, the Court recognized that the FLSA does not "preclude the application of a de minimis rule" for "negligible" time employees spend walking to and from their workplaces and on other preliminary and postliminary activities, *see id.* at 692-93, even where an employer requires that the employee engage in those activities:

The workweek contemplated by § 7(a) [of the FLSA] must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the [FLSA]. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Id.* at 692. The Court concluded that the "precise scope" of the de minimis rule's application to the employees required additional factfinding. *Id.* Thus, the Court remanded the case "for the determination of the amount of walking time involved and the amount of preliminary activities performed, giving due consideration to the de minimis doctrine and calculating the resulting damages under the Act." *Id.* at 694.

10

*The Portal-to-Portal Act*

As this Court explained in *Amaya*, one year after the Supreme Court decided *Anderson*, Congress passed the Portal-to-Portal Act ("PPA"), which amended the FLSA. *Amaya*, 479 Md. at 546. Congress enacted the PPA to supersede judicial decisions – including *Anderson* – that had interpreted the FLSA in ways that Congress viewed as being "in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers[.]" *Id.* at 546 n.14 (quoting 29 U.S.C. § 251, which set forth the "Congressional findings and declaration of policy" for the PPA). The PPA provides that certain activities of employees do not constitute "work" under the FLSA, regardless of their duration. These include time spent "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" and "activities which are preliminary to or postliminary to said principal activity or activities[.]" 29 U.S.C. § 254(a).

*Federal Regulations*

In 1961, the United States Department of Labor ("DOL") issued revised regulations concerning "hours worked." 26 Fed. Reg. 190 (Jan. 11, 1961). One of the new regulations was entitled "Where records show insubstantial or insignificant periods of time." It provided:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946)). This rule

11

applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (1961).[4]

In 1968, DOL promulgated a regulation entitled "Pay for non-productive hours distinguished." 33 Fed. Reg. 986 (Jan. 26, 1968). Section (a) of that regulation provides:

Under the Act an employee must be compensated for all hours worked. As a general rule the term "hours worked" will include:

(1) All time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace; and

(2) All time during which an employee is suffered or permitted to work whether or not he is required to do so.

29 C.F.R. § 778.223(a).

Section (b) provides more information about what does and does not qualify as "hours worked" under the FLSA:

[W]orking time is not limited to the hours spent in active productive labor, but includes time given by the employee to the employer even though part of the time may be spent in idleness. Some of the hours spent by employees, under certain circumstances, in such activities as waiting for work, remaining "on call", traveling on the employer's business or to and from workplaces,

---

[4] The regulation cited several lower federal court decisions applying the de minimis rule. *See* 29 C.F.R. § 785.47 (citing *Glenn L. Martin Nebraska Co. v. Culkin*, 197 F.2d 981, 987 (8th Cir. 1952), for the proposition that "working time amounting to $1 of additional compensation a week is 'not a trivial matter to a workingman,' and was not de minimis"; *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (2d Cir. 1953), which held that "[t]o disregard workweeks for which less than a dollar is due will produce capricious and unfair results"; and *Hawkins v. E. I. du Pont de Nemours & Co.*, 12 W.H. Cases 448, 27 Labor Cases, para. 69,094 (E.D. Va. 1955), for the proposition that "10 minutes a day is not de minimis"). The language of this regulation remains the same today.

and in meal periods and rest periods are regarded as working time and some are not. The governing principles are discussed in part 785 of this chapter (interpretative bulletin on "hours worked") and part 790 of this chapter (statement of effect of Portal-to-Portal Act of 1947).

*Id.* § 778.223(b).[5] One of the "governing principles … discussed in part 785 of this chapter" is the federal de minimis rule, 29 C.F.R. § 785.47.

*The Maryland Wage Laws*

In 1965 and 1966, respectively, the General Assembly enacted the Maryland Wage and Hour Law (the "MWHL") and the Maryland Wage Payment and Collection Law (the "MWPCL") (collectively, the "Maryland Wage Laws" or the "Wage Laws"). *See* 1965 Md. Laws, ch. 697, *codified at* Md. Code Ann., Lab. & Empl. ("LE") § 3-401 *et seq.* (1991, 2016 Repl. Vol.); 1966 Md. Laws, ch. 686, *codified at* LE § 3-501 *et seq.*

The MWHL, among other things, establishes employers' obligations to pay a minimum wage and overtime. LE §§ 3-413, 3-415. The MWPCL governs the timing of wage payments, *id.* § 3-502, and employers' obligations to pay wages when an employee is terminated. *Id.* § 3-505. Both statutes define "[w]age" as "all compensation that is due to an employee for employment." *Id.* §§ 3-401(d), 3-501(c)(1). Like the FLSA, the Maryland Wage Laws do not define the terms "work" or "compensable work." *Amaya*, 479 Md. at 566.

---

[5] Similarly, 29 C.F.R. § 778.103, the federal regulation concerning "[t]he workweek as the basis for applying section 7(a)" (the overtime provision of the FLSA), provides that "[t]he principles for determining what hours are hours worked within the meaning of the Act are discussed in part 785 of this chapter."

The MWHL references the FLSA in several places. *See* LE § 3-401(c) ("'Federal Act' means the federal Fair Labor Standards Act of 1938."); *id.* § 3-404(2) ("This subtitle does not diminish … a right of an employee that is granted under the federal Act."); *id.* § 3-413(b) (requiring employers to pay at least "the greater of … the minimum wage … under the federal Act" or "the State minimum wage").

*Maryland Regulations*

Similar to the definition of "hours worked" in 29 C.F.R. § 778.223(a)(1), COMAR 09.12.41.10A defines "[h]ours of work" as "the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace." However, unlike the federal regulation, COMAR 09.12.41.10 does not refer to 29 C.F.R. Parts 785 and 790 as setting forth "governing principles" relating to hours worked. COMAR 09.12.41.10 contains provisions that address two of the subjects covered in regulations contained in 29 C.F.R. Part 785. *See* COMAR 09.12.41.10B ("Meal periods are included in computing hours of work if the individual is required to perform any duties during the meal period."); 09.12.41.10C (prescribing the circumstances in which travel time is included in computing hours of work).

The Maryland regulation that governs overtime compensation provides that qualifying employees "shall be paid overtime compensation for each hour worked in excess of 40 hours per workweek." COMAR 09.12.41.14A. This includes "[a]ll hours worked by an employee for an employer …, even though the employee may perform work in two or more unrelated jobs[.]" *Id.* COMAR 09.12.41.14, like COMAR 09.12.41.10, does not refer to 29 C.F.R. Parts 785 and 790.

*Sandifer v. U.S. Steel Corp.*

In *Sandifer v. U.S. Steel Corporation*, 571 U.S. 220 (2014), the Supreme Court considered whether a provision of the FLSA[6] that allowed parties to agree that "time spent in changing clothes … at the beginning or end of each workday" is noncompensable, permitted the parties to decide in a collective bargaining agreement that "donning and doffing various pieces of protective gear" constituted noncompensable time. *Id.* at 223-24. The *Sandifer* Court held that "donning and doffing … the protective gear at issue qualifies as 'changing clothes' within the meaning of [the FLSA]." *Id.* at 232. Considering whether the de minimis doctrine applied in that specific case, the Court held that the doctrine "does not fit comfortably within the statute at issue" because that provision "is *all about* trifles – the relatively insignificant periods of time in which employees wash up and put on various items of clothing needed for their jobs." *Id.* at 234 (emphasis in original).

*Amaya*

In *Amaya*, construction workers sued their employers under the Maryland Wage Laws for failing to pay them for the time per day (which averaged approximately two hours) that they were required to spend traveling from a dedicated parking lot to their worksites in buses provided by their employers. 479 Md. at 522. Such time is not compensable under the PPA. Thus, this Court had to decide, among other things, whether the PPA had been incorporated into the Maryland Wage Laws. *See id.* at 522-23.

---

[6] 29 U.S.C. § 203(o).

We answered that question in the negative. *Id.* at 555. We explained that, since enacting the MWHL and MWPCL in 1965 and 1966, and in subsequent amendments, the General Assembly has not expressly adopted or incorporated the PPA. *Id.* Indeed, we observed, neither the MWHL nor the MWPCL refers to or even mentions the PPA. *Id.* And we noted that the related COMAR regulations have also not expressly incorporated the PPA. We "decline[d] to read the General Assembly's silence on such a significant matter, such as incorporating into Maryland statutes a federal law that limits compensation for work, as dispositive of the General Assembly's intent to incorporate the PPA into Maryland law." *Id.*

We found significant that, "after the Supreme Court's holdings that activities by employees, such as traveling in underground mines and being required to be on call as a firefighter, constituted work or employment within the meaning of the FLSA, Congress amended the FLSA by enacting the PPA to alleviate employers of liability for the failure to pay employees wages and overtime compensation for certain activities." *Id.* We saw nothing in the plain language of the Maryland Wage Laws that indicated the General Assembly intended the Wage Laws to adopt the PPA's provisions. *See id.* at 556. To the contrary, we observed, the General Assembly limited the MWHL's definition of "Federal Act" to "the federal Fair Labor Standards Act of 1938" without any additional reference to the PPA. *Id.* at 556-57. We added that, "[b]y not defining 'Federal Act' to include the PPA and by not referring to the PPA or using critical terms from the PPA (which are also used in the related federal regulations) in either the MWHL or the MWPCL, the plain language

16

of the statutes demonstrates that the PPA has not been adopted as Maryland law." *Id.* at 557.

Likewise, we observed, COMAR 09.12.41.10 (concerning hours of work) and other Maryland regulations related to the MWHL do not refer to the PPA, let alone adopt the PPA as part of Maryland law. *Id.* at 558. Nor does COMAR 09.12.41.10 mention principal activity or preliminary or postliminary activities or otherwise incorporate 29 C.F.R. § 790.7, the federal regulation describing preliminary and postliminary activities for purposes of the PPA, or any other federal regulation pertaining to the PPA. *Id.* "In other words," we explained, the Commissioner of the Maryland Department of Labor (the "Commissioner") "did not tie the description of hours of work for an employee in Maryland to only those activities that are identified as compensable under the PPA." *Id.* We noted that, by contrast, other COMAR regulations in the chapter concerning the MWHL expressly incorporate definitions from federal regulations that are unrelated to the PPA. *Id.* Thus, the absence in COMAR 09.12.41.10 of any reference to the PPA's restrictions on compensable work or hours of work was telling. We reasoned that COMAR 09.12.41.10 "provides a greater scope of compensation by stating that hours of work means time that an employee 'is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace' and includes certain travel time." *Id.* at 566. We concluded our discussion of the regulation by observing: "COMAR 09.12.41.10 describes what constitutes 'work' in Maryland and means what it says." *Id.*

Analyzing the legislative history of the Maryland Wage Laws, we reasoned that "[i]t does not make sense that the General Assembly would have silently or implicitly adopted

17

or incorporated the PPA into Maryland law." *Id.* at 560. That would mean that the General Assembly intended to make the PPA part of Maryland law but failed to "provide employees and employers alike any notice as to what would or would not constitute compensable work." *Id.*

**B. The De Minimis Doctrine Applies to Claims Brought Under the Maryland Wage Laws.**

Ms. Martinez argues that the General Assembly has not adopted or incorporated the de minimis doctrine into the Maryland Wage Laws. She relies on the Wage Laws' definition of "[w]age" as "*all* compensation that is due to an employee for employment," LE §§ 3-401(d), 3-501(c)(1) (emphasis added), which she contends is inconsistent with an intent to exclude even de minimis amounts of time spent at work. Ms. Martinez also points to the absence of any explicit reference to the de minimis doctrine in the MWHL or the MWPCL, as well as in pertinent Maryland regulations, including COMAR 09.12.41.10 and COMAR 09.12.41.14. In this regard, Ms. Martinez notes that the Maryland regulations differ from their federal counterparts by not referring to 29 C.F.R. Part 785 (which includes the federal de minimis regulation) as providing "governing principles." In Ms. Martinez's view, this makes the de minimis doctrine analogous to the PPA. She argues that, just as the PPA has not been incorporated into the Maryland Wage Laws and implementing regulations, the General Assembly and the Commissioner have not made the de minimis doctrine part of the Maryland Wage Laws and regulations. Thus, Ms. Martinez contends, we should reach the same result in this case as we reached in *Amaya* regarding the PPA. Ms. Martinez further argues that the de minimis rule contradicts the public policy

underlying the MWHL in that it requires workers, rather than employers, to absorb the economic cost of otherwise compensable work. Finally, Ms. Martinez relies on several out-of-state cases in which courts have declined to recognize incorporation of the de minimis rule into other states' wage laws, which she asserts are analogous to the Maryland Wage Laws. Ms. Martinez argues that we should adopt those courts' reasoning and hold to the same effect here.

Amazon contends that the de minimis doctrine is part of the Maryland Wage Laws, just as it is part of the FLSA. Amazon argues that the de minimis doctrine is a "background principle" of common law that applies to all enactments absent contrary indication, and that the General Assembly has provided no such contrary indication in the Wage Laws. Thus, according to Amazon, the de minimis doctrine would have been part of the Wage Laws, even if the Supreme Court had not recognized the applicability of the de minimis doctrine to the FLSA in *Anderson*. Amazon also observes that the definition of "wage" in the MWHL refers to "all compensation that is *due* to an employee for employment," LE §§ 3-401(d), 3-501(c)(1) (emphasis added), and asserts that the de minimis doctrine traditionally has applied to the concept of due compensation. Amazon further contends that the substantial similarities between the MWHL and the FLSA support applying the de minimis doctrine, as recognized by the Supreme Court in *Anderson*, to the Maryland Wage Laws. According to Amazon, these commonalities distinguish the FLSA from the PPA as applied to the Wage Laws. Amazon also asserts that, in light of the substantial similarities between the FLSA and the MWHL, this Court and the Attorney General of Maryland have frequently looked to the FLSA as persuasive authority in interpreting the MWHL. Amazon

19

contends that the out-of-state cases upon which Ms. Martinez relies are distinguishable. Finally, Amazon argues that the de minimis doctrine advances the purposes of the Maryland Wage Laws and public policy. According to Amazon, the de minimis doctrine is an important safety valve against unreasonable applications of general laws to impose liability for trivial amounts of time.

Resolution of the parties' competing contentions requires us to interpret pertinent provisions of the Maryland Wage Laws. As we have stated previously, the goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006). We do not "read statutory language in a vacuum, nor

do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *See, e.g.*, *In re O.P.*, 470 Md. 225, 255 (2020). Further, we "check our interpretation against the consequences of alternative readings of the text," *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. at 255. Doing so helps us "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense," *Mayor & Town Council of Oakland*, 392 Md. at 316; *see also Bell*, 460 Md. at 53 (explaining that, throughout the statutory interpretation process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

We conclude that a de minimis rule applies to the Maryland Wage Laws. We acknowledge that neither the phrase "de minimis," nor a description of the de minimis doctrine using other words, is present in the plain language of the Wage Laws. However,

21

the text of the FLSA also lacks any reference to the de minimis rule. Yet, the Supreme Court held in *Anderson* that the de minimis rule is applicable in "comput[ing]" the "workweek," *i.e.*, in determining whether an employee has been "required to give up a substantial measure of his time and effort," in which case "compensable working time is involved." 328 U.S. at 692. Thus, we cannot conclude from the absence of any reference to a de minimis rule in the Maryland Wage Laws that this doctrine is inapplicable in determining whether an employer has paid an employee "all compensation that is due … for employment." LE §§ 3-401(d), 3-501(c)(1).

We disagree with Ms. Martinez's contention that the de minimis rule "simply cannot be reconciled with the plain language of" the Wage Laws because those statutes define "wage" as "*all* compensation that is due to an employee for employment." *Id.* §§ 3-401(d), 3-501(c)(1) (emphasis added). According to Ms. Martinez, the word "all" in the definition of "wage" modifies "compensation," meaning that every bit of compensation, no matter how small, is included in the definition of "wage." As support for her proposition, Ms. Martinez directs us to *Gephart v. Strong*, 20 Md. 522 (1864). The statute at issue in *Gephart* stated: "In *all* decrees, orders, decisions and judgments, made by the Orphans' Court, the party who may deem himself aggrieved by such decree, order, decision or judgment, may appeal to the Court of Appeals[.]" *Id.* at 525 (emphasis added). This Court denied the appellees' motion to dismiss the appeal, rejecting the argument that "the matter is too small in amount to be entertained by an appellate tribunal[.]" *Id.* The Court explained that the de minimis doctrine "cannot prevail against an express statutory provision." *Id.*

According to Ms. Martinez, the word "all" in the definition of "wage" in the Maryland Wage Laws similarly forecloses any application of a principle that would prevent some wages from being disbursed to employees. We disagree. The similarities between the statute at issue in *Gephart* and the Wage Laws end at the word "all." The phrase "all compensation that is due" is naturally read as meaning *everything that is owed must be paid in full*, but it does not tell us *what* compensation is owed. Such language does not preclude a de minimis rule because de minimis principles operate at the threshold question of what is "due" in the first place. Thus, the inclusion of "all" in the text of the Wage Laws' definitions of "wage" does not operate to encompass the entirety of a particular category as it did in *Gephart*, and therefore does not foreclose the application of a de minimis rule to the Wage Laws.

Because the plain language of the Wage Laws does not resolve the interpretive question before us, we must "search[] for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Lockshin*, 412 Md. at 276. That search leads to the conclusion that, when the General Assembly enacted the Wage Laws, it intended a de minimis rule to apply to those laws.

This Court has described the MWHL as the State "equivalent," "parallel," "partner," and "counterpart" of the FLSA. *See Marshall v. Safeway, Inc.*, 437 Md. 542, 558 (2014) ("Maryland equivalent of [the] FLSA"); *Friolo v. Frankel*, 373 Md. 501, 513 (2003) ("*Friolo I*") ("the State parallel to the [FLSA]"); *id.* at 515 (MWHL "shares the benevolent purpose of its Federal partner, the [FLSA]"); *Friolo v. Frankel*, 438 Md. 304, 307 (2014)

23

("*Friolo II*") ("the Maryland counterpart to the [FLSA]"). These are apt descriptions, given that the MWHL mirrors the FLSA in many respects.

As Amazon observes in its brief, when the General Assembly enacted the MWHL in 1965, "it replicated many of the FLSA's features – such as setting a minimum wage, requiring employers to preserve employment records, and protecting employees from retaliation for whistleblowing." The MWHL's definitions of "employer" and "employee" shared similar language to those terms as defined in the FLSA. *Compare* 1965 Md. Laws 966-72 (ch. 697) (defining "[e]mployer" in part as any person "acting directly or indirectly in the interest of an employer in relation to an employee," and defining "[e]mployee" in part as "any individual employed by an employer"), *with* 29 U.S.C. § 203 (1964) (defining those terms in part the same). The MWHL also patterned many of its exemptions on those of the FLSA. *See* 1965 Md. Laws 967-68 (ch. 697); 29 U.S.C. § 213 (1964).

In 1967, the General Assembly amended the MWHL to include special wage rules for tipped workers found in the FLSA. *Compare* 1967 Md. Laws 945-49 (ch. 393), *with* Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 101, 80 Stat. 830, 830 (1966). And in 1971, the General Assembly amended the MWHL to include overtime exemptions, which again followed the FLSA's lead. *Compare* 1971 Md. Laws 1519-20 (ch. 709) (exempting in part car salesmen, hotel employees, and taxicab drivers), *with* 29 U.S.C. § 213(b) (1970) (exempting in part the same).

Today, the MWHL remains substantially similar to the FLSA. Today, as in 1965, they share the same purposes. *Compare* LE § 3-402(a) (MWHL addresses wage levels that "have been insufficient to provide adequate maintenance and to protect health"), *with* 29

24

U.S.C. § 202(a) (the FLSA ameliorates "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers"). Both statutes require employers to pay a minimum wage and time-and-a-half for overtime whenever an employee works more than 40 hours a week. LE §§ 3-402(a), 3-413, 3-415(a); 29 U.S.C. §§ 206(a), 207(a). Neither the MWHL nor the FLSA defines the terms "work" or "compensable work." But both statutes continue to share a virtually identical definition of "employer," *see* LE § 3-401(b); 29 U.S.C. § 203(d), as well as many similar exemptions. *See* LE §§ 3-403, 3-415(c); 29 U.S.C. § 213(a), (b). As noted above, the MWHL also expressly refers to the FLSA. *See* LE §§ 3-401(c) (defining "Federal Act" as "the federal Fair Labor Standards Act of 1938"), 3-404 (effect of the subtitle on employee rights under the FLSA), 3-413 (minimum wage requirement).[7]

Against this backdrop of the MWHL's substantial and consistent incorporation of the FLSA's provisions, we conclude that, when the General Assembly enacted the MWHL

---

[7] Given the substantial textual similarities between the FLSA and the Maryland Wage Laws, Maryland appellate courts have looked to the FLSA, and to federal courts' interpretations of the FLSA, in interpreting the Maryland Wage Laws. *See, e.g.*, *Newell v. Runnels*, 407 Md. 578, 649-53 (2009) (given the similarities in the definitions of "employer" in the FLSA and MWHL, adopting the same "economic reality" test from FLSA cases to determine whether a county was the plaintiffs' joint employer along with the State for purposes of the federal and state wage laws); *Amaya*, 479 Md. at 562 (describing as "[c]ritical to the outcome" in *Poe v. IESI MD Corp.*, 243 Md. App. 243 (2019), that "the relevant provisions of the FLSA and MWHL were substantially similar"). In addition, as Amazon points out, the Attorney General of Maryland has interpreted the Maryland Wage Laws by reference to FLSA standards. *See, e.g.*, 55 Op. Att'y Gen. 214, 215-18 (1970) (observing that the "regular hourly rate" of the FLSA and the "usual hourly rate" under the MWHL are "*in pari materia*" and therefore relying on federal authorities construing the FLSA provision in opining on how to compute overtime compensation under the MWHL).

25

in 1965, it intended also to incorporate the de minimis rule that was understood to apply to the FLSA following *Anderson*.[8]

In the 19 years between the Supreme Court's decision in *Anderson* and the General Assembly's enactment of the MWHL, federal courts applied the FLSA's de minimis principle on several occasions. *See, e.g.*, *E.I. Du Pont De Nemours & Co. v. Harrup*, 227 F.2d 133, 136 (4th Cir. 1955); *Frank v. Wilson & Co., Inc.*, 172 F.2d 712, 716 (7th Cir. 1949); *Bridgeman v. Ford, Bacon & Davis*, 161 F.2d 962, 965 (8th Cir. 1947). Congress did not amend the FLSA to abrogate the Supreme Court's holding in *Anderson* regarding the de minimis doctrine. And, as discussed above, in 1961 DOL promulgated a regulation that drew upon other federal decisions in explicating the application of the de minimis doctrine to the FLSA.

In short, when the General Assembly enacted the MWHL in 1965, it was clear that the de minimis doctrine applied to the FLSA. Given its decision to pattern the MWHL on the FLSA, we presume that the General Assembly was aware of *Anderson* and its recognition of the applicability of the de minimis doctrine in determining whether work is compensable under the FLSA, as well as Congress's acquiescence to that judicial interpretation. *See Royal Plaza Cmty. Ass'n, Inc. v. Bonds*, 389 Md. 187, 204 (2005) ("The legislative body is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute.")

---

[8] Because we conclude that the General Assembly intended a de minimis rule to apply to the Wage Laws, we need not address Amazon's alternative argument that the de minimis rule applies to the Wage Laws because it is a "background principle" that applies to every statute unless the General Assembly indicates otherwise.

(cleaned up). That being the case, had the General Assembly not intended a de minimis rule to apply to the MWHL's provisions concerning the compensability of work (and to the MWPCL when it enacted that law a year later[9]), we believe it would have said so. In particular, the General Assembly likely would have supplied its own definition of "work" or "hours worked," rather than leaving those terms undefined in the MWHL, as the FLSA leaves them undefined.

Ms. Martinez's arguments to the contrary are unpersuasive. We disagree with Ms. Martinez that the General Assembly's silence concerning the de minimis rule is equivalent to its silence concerning the PPA. As discussed, the FLSA is silent with respect to the de minimis rule. It was the Supreme Court in *Anderson* that recognized the doctrine's application to the FLSA. For this reason, we find it unremarkable that the General Assembly would incorporate the de minimis rule in the Maryland counterpart to the FLSA without including a de minimis provision in the text of the statute.

The PPA materially differs from the de minimis rule. Unlike the de minimis rule, which is part and parcel of the original FLSA, the PPA was an amendment to the FLSA. In *Amaya*, we cataloged how the Maryland Wage Laws repeatedly reference and track the FLSA, but not the PPA. 479 Md. at 556-57. While that analysis in *Amaya* evinced the General Assembly's intent not to incorporate the PPA into the Maryland Wage Laws, here

---

[9] Because the definition of "wage" in the MWPCL is the same as in the MWHL, our conclusion that the General Assembly intended to incorporate a de minimis rule into the MWHL leads us also to conclude that the de minimis doctrine applies to the MWPCL. Given that the two Wage Laws work hand in hand, we agree with Amazon that "[i]t would make no sense to apply the de minimis doctrine to the substantive wage statute but not to the statute governing only when those wages are paid."

27

it leads to the opposite conclusion. By repeatedly referencing the FLSA in the MWHL, the General Assembly demonstrated its intent to incorporate the core provisions of the FLSA into the MWHL, including as those provisions had been interpreted by the Supreme Court in *Anderson*. That included both of *Anderson*'s holdings: first, that the "workweek" includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace"; and second, its recognition that the FLSA does not "preclude the application of a de minimis rule" for "negligible" time employees spend walking to and from their workplaces and on other preliminary and postliminary activities. *Anderson*, 328 U.S. at 690-91, 692.

We also disagree with Ms. Martinez's contention that COMAR 09.12.41.10 shows that the de minimis rule is not applicable to the MWHL. First, because we have concluded that the General Assembly intended a de minimis rule to apply to the MWHL, it would be beyond the scope of the Commissioner's authority to write the de minimis rule out of the law. *See Ins. Comm'r v. Bankers Indep. Ins. Co.*, 326 Md. 617, 623 (1992) ("[I]t is axiomatic that an administrative regulation must be consistent with the letter and policy of the statute under which the administrative agency acts."). Second, COMAR's definition of "hours of work" is almost verbatim *Anderson*'s description of an FLSA "workweek." *Compare Anderson*, 328 U.S. at 690-91 ("statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace"), *with* COMAR 09.12.41.10A ("[h]ours of work" defined as "the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace"). This

is strong evidence that the Commissioner understood the relevant provisions of the MWHL to be consistent with the parallel provisions of the FLSA, as interpreted by the Supreme Court in *Anderson*, including the de minimis rule. The fact that the Commissioner did not cite to the federal de minimis regulation, 29 C.F.R. § 785.47, as a "governing principle" in COMAR 09.12.41.10 or COMAR 09.12.41.14 – thus distinguishing those Maryland regulations from 29 C.F.R. §§ 778.223(b) and 778.103 – reveals at most that the Commissioner did not agree with 29 C.F.R. § 785.47's explication of the de minimis doctrine in the context of wage laws. It does not – and cannot – stand for the proposition that no de minimis rule in any form applies to the MWHL or the MWPCL.

Ms. Martinez cites four cases in which courts have held that state wage laws do not incorporate a de minimis rule, but they are distinguishable. The Pennsylvania statute at issue in *In re Amazon.com, Inc.* required payment for "all hours worked[.]" 255 A.3d 191, 202 (Pa. 2021) (quoting 43 Pa. Stat. § 333.104(a)). Similarly, the statute that the Washington Court of Appeals analyzed in *Robertson v. Valley Communications Center*, Wash. Rev. Code § 49.46.130(4)(a), required overtime compensation "for all hours worked over forty hours in one week[.]" 490 P.3d 230, 237 (Wash. Ct. App. 2021). The California wage order at issue in *Troester v. Starbucks Corporation* provided that wages must be paid to an employee "for all hours worked." 421 P.3d 1114, 1119-20 (Cal. 2018).[10] And the New Jersey statute that was the subject of *Vaccaro v. Amazon.com.dedc, LLC*, 2024 WL

---

[10] It also should be noted that the *Troester* Court "decline[d] to decide whether a de minimis principle may ever apply to wage and hour claims given the wide range of scenarios in which this issue arises." 421 P.3d at 1121.

4615762 (D.N.J. Oct. 30, 2024), also required compensation for "all hours worked." *Id.* at *14. In contrast to all of these provisions, the Maryland Wage Laws define "wage" as "all compensation that is *due* to an employee for employment," LE §§ 3-401(d), 3-501(c)(1) (emphasis added), which, as discussed above, is consistent with application of a de minimis rule.

Finally, we disagree with Ms. Martinez's view that it would be unreasonable to interpret the Maryland Wage Laws to include a de minimis rule. As Ms. Martinez puts it, a de minimis rule

> requires workers – rather than employers – to absorb the economic cost of otherwise compensable "work." This is unjust. Why, for example, should warehouse workers like Ms. Martinez be shortchanged just because their multi-billion-dollar employer – that is known for its technological sophistication and ability to track the most minute movements in commerce – views security screening time as "insignificant" or "*de minimis*" or not worth measuring? If, as *Anderson* states, the *de minimis* doctrine really is about "trifles," shouldn't the company – rather than the hourly worker – be responsible for such trifles?

In essence, Ms. Martinez's position is that a de minimis rule is incompatible with remedial legislation such as the Maryland Wage Laws.[11]

But the FLSA, too, is remedial in nature. *See Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959) ("[W]ithin the tests of coverage fashioned by

---

[11] The Dissent notes that the General Assembly amended the MWPCL in 1993 to authorize an employee to bring an action against an employer to recover unpaid wages. *See* Dissenting Op. of Watts, J., at 15-17, 18-19. The private right of action under the MWPCL was "designed to ensure that an employee will have the assistance of competent counsel in pursuing what is likely to be a relatively small claim." *Ocean City, Md., Chamber of Com., Inc. v. Barufaldi*, 434 Md. 381, 393 (2013). A "relatively small claim" is not synonymous with a "de minimis" claim.

Congress, the Act has been construed liberally to apply to the furthest reaches consistent with congressional direction."). And, as discussed, the de minimis doctrine applies to the comparable provisions of the FLSA. That makes sense because the FLSA, like "[m]ost legislation[,] reflects a balance of competing interests." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 53 (2025). That is, although the FLSA is remedial in nature, "the public interest in [FLSA] cases does not fall entirely on the side of employees." *Id.*

The same is true with respect to the Maryland Wage Laws, which apply to employers of all sizes and that have access to varying levels of technology and other resources. Like the FLSA, the Maryland Wage Laws reflect a balance of competing interests. The Wage Laws require an employer to pay wages for time "during a workweek that an individual … is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace." COMAR 09.12.41.10. But the Wage Laws are not intended to impose liability on employers – small, medium, or large – who fail to account for "[s]plit-second absurdities" due to "the realities of the industrial world" and the "actualities of working conditions[.]" *Anderson*, 328 U.S. at 692.[12]

---

[12] As counsel for Amazon observed at oral argument, a de minimis rule would not be compatible with a law that specifically makes all time spent in security screening compensable. The de minimis doctrine would "not fit comfortably within" such a statute because, like the clothes-changing provision at issue in *Sandifer*, a provision specifically addressing the compensability of security screening time would be "all about trifles." *Sandifer*, 571 U.S. at 234.

For the reasons discussed, we conclude that the de minimis doctrine applies to claims brought under the Maryland Wage Laws.[13]

## IV

## Conclusion

For the reasons stated above, we answer the certified question in the affirmative, and hold that the de minimis doctrine applies to claims brought under the Maryland Wage and Hour Law and the Maryland Wage Payment and Collection Law.

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY.**

---

[13] Our answer seemingly begs the additional question: What is the scope of the de minimis rule under the Maryland Wage Laws? That is not a question the district court has asked us to answer. The district court stated in its certifying order that "[o]nce the certified question is resolved, existing authority will provide the Court with adequate guidance to resolve [Amazon's] pending motion for summary judgment." We have resolved the certified question and therefore "may go no further[.]" *Dickson*, 478 Md. at 260 (internal quotation marks and citations omitted). How a trier of fact should determine whether a particular amount of time worked is or is not de minimis under the Maryland Wage Laws remains to be seen.

32

United States District Court for the District of Maryland
Case No. 22-00502-BAH

Argued: March 4, 2025

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 17

September Term, 2024

_____

ESTEFANY MARTINEZ

v.

AMAZON.COM SERVICES, LLC

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Watts, J., which Eaves, J., joins.

_____

Filed:  July 3, 2025

Respectfully, I dissent. I disagree with the Majority's holding that the federal doctrine of *de minimis non curat lex* applies to claims brought under the Maryland Wage Payment and Collection Law ("MWPCL"), Lab. & Empl. (1991, 2016 Repl. Vol.) ("LE") §§ 3-501 to 3-509, and the Maryland Wage and Hour Law ("MWHL"), LE §§ 3-401 to 3-431. See Maj. Slip Op. at 1. In this case, the Court was asked to answer a question of statutory interpretation certified by the United States District Court for the District of Maryland. Specifically, we were asked to determine whether the doctrine of *de minimis non curat lex* applies to claims brought under the MWPCL and MWHL (collectively, the "Maryland Wage Laws"). In my view, the Majority's holding that "the de minimis doctrine applies to claims brought under the Maryland Wage Laws" is incorrect. Maj. Slip Op. at 32. The federal *de minimis* doctrine has not been adopted into the MWHL or the MWPCL nor should it be incorporated by this Court into either.

Estefany Martinez, Appellant, sued Amazon.com Services, LLC ("Amazon"), Appellee, for unpaid compensation for time spent waiting to undergo and undergoing mandatory security screenings at the Amazon "fulfillment center" (or "warehouse") in Maryland where she worked. Ms. Martinez sued on behalf of herself and a class consisting of current or former employees of all the Amazon fulfillment centers in Maryland, totaling 23,914 employees. Amazon argued in the District Court, in part, that the time spent waiting to undergo and undergoing the screenings is *de minimis*, and therefore not compensable under the Maryland Wage Laws. Finding a lack of governing state law, while acknowledging that the doctrine applies to the Federal Labor Standards Act ("FLSA"), the District Court certified to this Court the question of whether the Maryland Wage Laws

allow for a *de minimis* exception.

The roots of the doctrine of *de minimis non curat lex*, literally translated as "[t]he law does not concern itself with trifles," *de minimis non curat lex*, Black's Law Dictionary (12th ed. 2024), "stretch to ancient soil[.]" Sandifer v. U.S. Steel Corp., 571 U.S. 220, 233 (2014). However, its application under the FLSA, see 29 U.S.C. §§ 201 to 219, has a more modern history.

The FLSA was enacted in 1938 to establish a minimum wage, see 29 U.S.C. § 206(a)(1), and requires certain employers to provide overtime compensation for time worked beyond a forty-hour workweek, see 29 U.S.C. § 207(a). In 1946, the Supreme Court of the United States considered the meaning of "working time" under the FLSA. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 682 (1946). In Anderson, see id. at 682-83, 691, 693, in considering the time workers spent walking to their workstations in a pottery plant and preparing equipment, the Supreme Court held that the time employees spent walking to their working places and performing preliminary duties constituted work time that must be compensated under the FLSA.

The Supreme Court did not, however, rule out application of the *de minimis* rule for "negligible" time spent walking or "insubstantial and insignificant periods of time" conducting preliminary activities. Id. at 692-93. The Supreme Court stated that "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act." Id. at 692.

The Supreme Court's opinion in <u>Anderson</u> quickly led to numerous actions brought under the FLSA for compensation for time employees spent conducting alleged preliminary duties, with the potential liability for employers estimated to exceed one billion dollars. <u>See</u> <u>Sandifer</u>, 571 U.S. at 225. In response, Congress passed the Portal-to-Portal Act of 1947 ("PPA"), limiting the scope of employers' liability for mandatorily compensable time for certain activities. <u>See</u> <u>id.</u> In 1961, the Department of Labor ("DOL") issued a regulation describing the *de minimis* doctrine as applied to the FLSA. <u>See</u> 26 Fed. Reg. 195 (Jan. 11, 1961). The regulation states: "In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis." 29 C.F.R. § 785.47 (citation omitted).

The regulation provides that the rule "applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realties." <u>Id.</u> The regulation also states that "[a]n employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." <u>Id.</u> In support of its language, the regulation cites federal case law in which it was held that "working time amounting to $1 of additional compensation a week is not a trivial matter to a workingman, and was not de minimis" and that "10 minutes a day is not de minimis." <u>Id.</u> (cleaned up).

Over 50 years after the *de minimis* regulation was first promulgated, the Supreme Court of the United States decided two workplace compensation cases in which the *de minimis* doctrine was mentioned but not applied. In 2014, the Supreme Court of the United States resolved two workplace compensation disputes under the FLSA, as amended by the PPA. See Sandifer, 571 U.S. at 222-23; Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 29 (2014). In Sandifer, 571 U.S. at 222-24, 232-34, where steelworkers brought a collective action pursuant to the FLSA against their employer, alleging that the employer violated the FLSA by failing to compensate them for time spent donning and doffing protective gear, the Supreme Court declined to apply the *de minimis* doctrine, holding instead that the time spent donning and doffing protective gear was time spent "changing clothes," which, under the FLSA, allowed the parties to collectively bargain over compensability of time spent changing clothes at the beginning or end of the workday. The District Court had granted summary judgment in part to the employer, assuming that the donning and removing of certain items such as hardhats, glasses, and earplugs were not "clothes," and the time spent donning and doffing such items was "'*de minimis*' and hence noncompensable." Id. at 224. The Court of Appeals for the Seventh Circuit upheld the District Court's conclusions. See id. The Supreme Court affirmed the judgment of the Court of Appeals but concluded that "it doubt[ed] that the *de minimis* doctrine [could] properly be applied to the present case" and that the doctrine did "not fit comfortably within the statute at issue[.]" Id. at 224, 234.

In declining to apply the *de minimis* rule, the Supreme Court described the origin of the doctrine with respect to the FLSA as follows:

> Although the roots of the *de minimis* doctrine stretch to ancient soil, its application in the present context began with *Anderson*. There, the Court declared that because "[s]plit-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act," such "trifles" as "a few seconds or minutes of work beyond the scheduled working hours" may be "disregarded." 328 U.S., at 692, 66 S.Ct. 1187. "We [thus] do not ... preclude the application of a de minimis rule." *Ibid.*

Sandifer, 571 U.S. at 233-34 (alterations and ellipsis in original). After explaining that

Anderson did not preclude use of the *de minimis* rule, the Supreme Court pointed out that

"the current regulations of the Labor Department apply a stricter *de minimis* standard than

*Anderson* expressed. They specify that an employer may not arbitrarily fail to count as

hours worked any part, however small, of the employee's fixed or regular working time[.]"

Sandifer, 571 U.S. at 234 n.8 (cleaned up). The Supreme Court concluded that the *de*

*minimis* rule did not apply to the statute at issue, section 203(o) of the FLSA,[1] as "in the

context of the present case, there [was] no more reason to *disregard* the minute or so

necessary to put on glasses, earplugs, and respirators, than there [was] to *regard* the minute

or so necessary to put on a snood." Id. at 234 (emphasis in original).

Months later, in Busk, 574 U.S. at 29, 31, when considering whether time spent

waiting to undergo and undergoing mandatory security screenings in an Amazon

warehouse was compensable time under the FLSA, as amended by the PPA, the Supreme

Court did not apply the *de minimis* doctrine. Instead, the Supreme Court held that waiting

---

[1]The provision at issue, 29 U.S.C. § 203(o), excludes from the definition of "hours worked" "any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee."

- 5 -

and undergoing security screenings when leaving an Amazon warehouse are activities that are not "integral and indispensable to the principal activities that an employee is employed to perform[,]" and therefore the time spent completing the activities was not compensable. Id. at 37. The "integral and indispensable test" was based on the Supreme Court's interpretation of the PPA, which exempted employers from paying for employees' time spent conducting "activities which are preliminary to or postliminary to [] principal activity or activities[]" that an employee is hired to complete. Id. at 32-33. Given that this Court has held that the PPA is not incorporated into the Maryland Wage Laws, the Supreme Court's holding in Busk provides Amazon no relief here. See Amaya v. DGS Constr., LLC, 479 Md. 515, 525, 278 A.3d 1216, 1222 (2022) ("[W]e hold that the PPA has not been adopted or incorporated into Maryland law in either the MWHL, the MWPCL, or relevant COMAR regulations.").

The case law pertaining to the federal *de minimis* doctrine as applied to the FLSA makes even defining the parameters of the doctrine with respect to its application to the FLSA difficult. The federal case law yields no principles that indicate the *de minimis* doctrine should apply to state wage laws. In my view, the question before this Court—whether the federal *de minimis* doctrine applies to the Maryland Wage Laws, the MWPCL and the MWHL—must be answered with our well-established traditional principles of statutory construction.

Ms. Martinez contends that neither the Maryland Wage Laws nor their regulations establish a *de minimis* doctrine by its plain language. Amazon, on the other hand, contends that the statutes' language is ambiguous, and that relevant provisions of the Maryland

Wage Laws mirror the FLSA, and thus interpretation of the federal law is persuasive authority in interpreting the Maryland equivalent. Amazon also contends that the doctrine is a "background principle" in Maryland, and presumptively applies to Maryland statutes unless explicitly disavowed by the General Assembly.

For the reasons stated below, I would hold that the federal *de minimis* doctrine has not been adopted or incorporated into either the MWHL or the MWPCL. As we recently held in Amaya, 479 Md. at 557, 278 A.3d at 1241, the General Assembly knows how to demonstrate its desire to incorporate a federal law into a Maryland statute when it defines a term or refers to other statutes. By their plain language, the MWHL, MWPCL, and related regulations lack any reference or mention of the *de minimis* doctrine. I would hold, as we held in Amaya, id. at 560, 278 A.3d at 1243, in considering whether the PPA had been incorporated into the Maryland Wage Laws, that "[t]he General Assembly's omission of any mention of the [*de minimis* doctrine] speaks for itself and means that the [*de minimis* doctrine] is not part of Maryland law."

In addition, the legislative history of the Maryland Wage Laws demonstrates no intent whatsoever by the General Assembly to incorporate a *de minimis* principle into the statutes and demonstrates that the statutes were enacted for purposes that are contrary to an intent to deprive employees of payment for small amounts of work time. Moreover, any alleged background *de minimis* principle that may potentially exist in Maryland case law cannot prevail over unambiguous statutory language and legislative history demonstrating that the principle has not been incorporated into the Maryland Wage Laws. Based on basic principles of statutory construction, the clear answer to the question above is "no."

**The MWHL, the MWPCL, and COMAR: Plain Language**

Even if the application of the doctrine were clear in the federal context (which it is not), as with any matter involving statutory construction, one would begin by examining the plain language of the statutes at issue to discern the intent of the General Assembly. "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly." Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc., 456 Md. 272, 294, 173 A.3d 549, 561 (2017) (citation omitted). This Court has set forth the relevant rules of statutory construction, stating:

> As this Court has explained, to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

Id. at 294, 173 A.3d at 561-62 (citation omitted).

The Maryland Wage Laws, the MWHL and the MWPCL, unambiguously provide that employees must receive all compensation that is due for employment. LE § 3-401(d) defines "Wage" as "all compensation that is due to an employee for employment." LE § 3-402, titled "Legislative findings and purpose," provides:

> (a) The General Assembly finds that wages in some occupations in the State have been insufficient to provide adequate maintenance and to protect health.

(b) The purpose of this subtitle is to set minimum wage standards in the State to:

> (1) provide a maintenance level that is consistent with the needs of the population for their efficiency, general well-being, and health;
> (2) safeguard employers and employees against unfair competition;
> (3) increase the stability of industry;
> (4) increase the buying power of employees; and
> (5) decrease the need to spend public money for the relief of employees.

LE § 3-413(b) requires an employer to pay an employee at least the greater of the State or federal minimum wage.

The MWHL states that it "does not diminish[] a right of an employee that is granted under the federal Act[,]" LE § 3-404(2), *i.e.*, "the federal Fair Labor Standards Act of 1938[,]" LE § 3-401(c). In addition to the rights granted under the FLSA, under LE § 3-427(a), an employee may bring an action against their employer to recover unpaid wages, liquidated damages, and counsel fees and other costs. The Commissioner of Labor and Industry ("Commissioner"), who is responsible, among other duties, for trying to promote and develop the welfare of wage earners, see LE § 2-105, may take an assignment of the claim in trust for the employee and consolidate two or more claims against an employer, see LE § 3-427(b).

Like the MWHL, the MWPCL defines "Wage" as "all compensation that is due to an employee for employment." LE § 3-501(c)(1). LE § 3-502 requires employers to pay employees on a regular schedule. The MWPCL requires employers to provide employees, at the time of hiring, written notice of the rate of pay, the regular paydays the employer sets, and leave benefits. See LE § 3-504(a)(1). Employers are required to provide a written

statement with each pay period setting forth the pay rate and gross and net pay earned for the pay period and must pay "all wages due" upon termination. LE §§ 3-504(a)(2), 3-505. The MWPCL adds that a "wage" includes: "(i) a bonus; (ii) a commission; (iii) a fringe benefit; (iv) overtime wages; or (v) any other remuneration promised for service." LE § 3-501(c)(2) (paragraph breaks omitted).

If an employer fails to pay wages, the employee can file a complaint with the Commissioner. See LE § 3-507.1. Under LE § 3-507, the MWPCL may be enforced by the Commissioner, who, among other actions, "with the written consent of the employee, may ask the Attorney General to bring an action" on the employee's behalf or "may bring an action on behalf of an employee in the county where the violation allegedly occurred[,]" and if in such an action the employer is found to be in violation of the MWPCL and the violation is "not as a result of a bona fide dispute," the court may award treble damages and reasonable counsel fees and other costs. The MWPCL permits an employee to bring an action against an employer to recover unpaid wages after two weeks have elapsed from the date on which the employer was required to have paid the wages. See LE § 3-507.2(a). A court may award treble damages and reasonable counsel fees and other costs if the employer withheld wages in violation of the MWPCL and not as a result of a bona fide dispute. See LE § 3-507.2(b).

Pursuant to LE § 3-410, "[i]n addition to any regulation specifically required by [the MWHL]," the Commissioner may adopt other regulations to carry out the Act including some specified in the statute. COMAR contains a chapter of regulations related to the MWHL, located at Title 09, Subtitle 12, Chapter 41. COMAR 09.12.41.10, concerning

the hours of work, in pertinent part states: "'Hours of work' means the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace." COMAR 09.12.41.10A. COMAR 09.12.41.14A-B requires eligible employees to receive time and one-half overtime pay for "[a]ll hours worked" "in excess of 40 hours per workweek."

In short, both the MWHL and the MWPCL mandate that an employer pay, as "wages," "all compensation that is due to an employee for employment" and COMAR defines hours of work as the time that an employee is required by an employer to be on the employer's premise. LE § 3-401(d); LE § 3-501(c)(l); COMAR 09.12.41.10A. There is no indication in the plain language of the Maryland Wage Laws that the General Assembly has incorporated or intended a *de minimis* rule to apply to exclude payment of wages for any amount of time worked, no matter how small. Nor has the Maryland Department of Labor promulgated a regulation permitting the *de minimis* doctrine to be applied to the Maryland Wage Laws. The absence of any statute or regulation in Maryland providing for application of the *de minimis* doctrine to the Maryland Wage Laws speaks for itself. There is nothing in the plain language of the statutes that even suggests that the General Assembly intended for the *de minimis* doctrine to apply to the Maryland Wage Laws.

As explained above, neither the Maryland Wage Laws nor the regulations reference or mention the *de minimis* doctrine. Amazon concedes as much, as does the Majority. See Maj. Slip Op. at 21. Moreover, neither the definitions of "wage" in the MWHL and MWPCL, see LE §§ 3-401(d), 3-501(c)(1), nor the regulation defining "hours of work" in COMAR 09.12.41.10, include any limiting principles that could be considered as

- 11 -

incorporating, adopting, or applying the *de minimis* doctrine. A "wage" in Maryland includes "*all* compensation that is due to an employee for employment." LE §§ 3-401(d), 3-501(c)(1) (emphasis added). Read together with COMAR 09.12.41.10, "all compensation that is due" for "hours of work" is not limited, by its plain language, based on an amount owed or time spent working being small or able to be characterized as *de minimis*. "[W]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." Lillian C. Blentlinger, LLC, 456 Md. at 294, 173 A.3d at 562 (citation omitted). The plain language of the MWHL and the MWPCL is clear and does not incorporate the *de minimis* doctrine as part of Maryland law or allow for the doctrine to be read into the statutes.

**The MWHL, the MWPCL, and COMAR: Legislative History**

Because the language of the MWHL, the MWPCL, and COMAR is clear and does not incorporate the *de minimis* doctrine as part of Maryland law, the analysis could end here. However, in my view, it is equally clear that the legislative history of the Maryland Wage Laws demonstrates that the *de minimis* doctrine has not been incorporated into the Maryland Wage Laws. The intent of the General Assembly in enacting the Maryland Wage Laws was to ensure that employees are compensated for all work performed and that workers are treated fairly, and that purpose spans the laws' approximately sixty-year history.

Like the statutes' plain language, the legislative history of the Maryland Wage Laws plainly demonstrates that the General Assembly did not intend to incorporate a *de*

- 12 -

*minimis* rule to exclude payment of wages to employees in Maryland. In 1965, the General Assembly enacted the MWHL, initially codified at Md. Code (1957, 1965 Repl. Vol.), Art. 100, §§ 81-93, for the purpose of "establishing a wage and hour law fixing minimum wages for employees, with certain exceptions . . . and relating generally to the wages paid to and the hours worked by employees in this State." 1965 Md. Laws 966 (Ch. 697, S.B. 468). In enacting the MWHL, the General Assembly made certain findings. See id. Md. Code, Art. 100, § 81 set forth the General Assembly's finding "that there are persons employed in some occupations in the State of Maryland at wages insufficient to provide adequate maintenance and to protect health." 1965 Md. Laws 966; see also LE § 3-402(a). Md. Code, Art. 100, § 81 stated that the policy of the Act was "to establish minimum wage compensations standards in the State of Maryland to provide a maintenance level consistent with the needs of the population for their health, efficiency, and general well-being[,]" with "[a]ny agreement to work for less be[ing] null and void." 1965 Md. Laws 967; see also LE §§ 3-402(b)(1), 3-405. The General Assembly found that this policy would "tend to safeguard employers and their employees against unfair competition and [would] increase the stability of industry and the purchasing power of employees and decrease the need for supplemental payments of public moneys for the relief of these employees." 1965 Md. Laws 967; see also LE § 3-402(b)(2) to (b)(5). This Court has stated that "[t]he standards, are, indeed, minimal ones, and it is critical, if the legislative purposes are to be attained and preserved, that those standards be vigorously enforced." Friolo v. Frankel, 373 Md. 501, 515, 819 A.2d 354, 363 (2003).

Over the years, the MWHL has been amended. For example, in 1971, the MWHL

was amended "to exempt certain classes of employees from the provisions of the Wage and Hour Law in relation to payment for overtime." 1971 Md. Laws 1519 (Ch. 709, H.B. 600). Specifically, certain employees, including car salespeople, hotel employees, and taxicab drivers, were exempt from receiving a wage of one and one-half times their usual hourly wage rate for any hours worked in excess of forty hours during any work week. See id. at 1519-20. In 1979, the MWHL was amended to change the definition of "tipped employee," "chang[e] the criteria for determining the wage of a tipped employee[,]" and provide that the MWHL "applied only in certain instances[.]" 1979 Md. Laws 860 (Ch. 238, S.B. 247).

In 1966, the year after the MWHL was enacted, the General Assembly enacted the MWPCL, originally codified at Md. Code (1957, 1966 Repl. Vol.), Art. 100, § 94, for the purpose of "relating generally to wage payment and collection, imposing requirements as to the regularity, frequency and medium of wage payments and permissible deductions therefrom[.]" 1966 Md. Laws 1213 (Ch. 686, H.B. 784). Md. Code, Art. 100, § 94 provided that all employers must establish regular pay periods and pay wages or salaries in United States currency or by a check that, on demand, is payable in United States currency. See 1966 Md. Laws 1213; see also LE § 3-502(a), (c).

As originally enacted, the MWPCL "provided for civil enforcement by the Commissioner of Labor and Industry, but did not include a private right of action for workers themselves." Ocean City, Md., Chamber of Com., Inc. v. Barufaldi, 434 Md. 381, 391, 75 A.3d 952, 958 (2013) (citing 1966 Md. Laws 1213); see also Md. Code, Art. 100, § 94(e) ("The Commissioner . . . with the written and signed consent of an employee, may

- 14 -

institute proceedings on behalf of an employee to enforce compliance with this Section[.]"). In 1983, the MWPCL was amended to "encourage[] compliance by allowing a court in such an action to award up to three times the unpaid wages if the court found that the withholding was not the result of a 'bona fide dispute'—a provision that now appears in LE § 3-507(b)." Barufaldi, 434 Md. at 391-92, 75 A.3d at 958 (cleaned up). As this Court noted, "[p]revious amendments had added a civil penalty provision—at first 10 percent, and later 20 percent, of the wages due. That provision was eliminated when the treble damages provision was added." Id. at 392 n.7, 75 A.3d at 958 n.7 (citations omitted). A "1974 amendment also added a misdemeanor criminal penalty, which currently is codified at LE § 3-508." Id. at 392 n.7, 75 A.3d at 958 n.7.

In Barufaldi, id. at 392-94, 75 A.3d at 958-59, this Court set forth the background and legislative history that led to the 1993 enactment of LE § 3-507.1 (now codified at LE § 3-507.2)—the statute that authorizes an employee to bring an action against an employer to recover unpaid wages. Problems arose in 1991 when "budget cuts resulted in the elimination of the unit of the Division of Labor and Industry that enforced the" MWPCL. Id. at 392, 75 A.3d at 958 (footnote omitted). To address the issue, two bills—House Bill 1006 (1993) and Senate Bill 274 (1993)—"were introduced in the General Assembly to create a private right of action under the statute." Id. at 392, 75 A.3d at 958. We described the different approaches proposed by the bills as follows:

> Senate Bill 274, as originally proposed, would have provided a private right of action to recover unpaid wages, but without any provision for recovering attorneys' fees and costs. Proponents of a private right of action urged the addition of a fee-shifting provision to establish a stronger deterrent for employers to comply with the law and—given the relatively small

- 15 -

amounts typically at issue—a stronger incentive for private attorneys to undertake representation in wage cases. *See* Letter from Constance Belfiore, Executive Director, The Law Foundation of Prince George's County, Inc., to Senator Thomas P. O'Reilly, Chairman, Senate Finance Committee (February 12, 1993); Letter from Winifred C. Borden, Executive Director, Maryland Volunteer Lawyers Service, to Senator Thomas P. O'Reilly (February 9, 1993).

In contrast, House Bill 1006, as originally filed, would have provided for the automatic award of attorneys' fees and treble damages to a successful plaintiff, regardless of whether there was a "bona fide dispute" about the employee's entitlement to the wages. Opponents argued that the bill would discourage settlements and encourage litigation as employees might opt to go to trial in hopes of winning automatic treble damages. Letter from the Maryland Chamber of Commerce to Senator Thomas P. O'Reilly (March 31, 1993) at 2. There was also concern that, without a "bona fide dispute" defense, "employers would be vulnerable to unscrupulous individuals who might pursue claims in court to obtain payment of such fees and costs." *Id.*

Barufaldi, 434 Md. at 392-93, 75 A.3d at 958-59. See also Friolo, 373 Md. at 516-17, 819 A.2d at 363-64 (discussing in detail the legislative history of the enactment of what is now LE § 3-507.2).

Ultimately, a compromise was reached and "[t]he final version of the legislation allowed (rather than mandated) an award of attorneys' fees as well as treble damages to a successful plaintiff, contingent upon a finding that the withholding of the wages was not part of a 'bona fide dispute.'" Barufaldi, 434 Md. at 393, 75 A.3d at 959 (citing 1993 Md. Laws 2868 (Ch. 578, H.B. 1006)). As this Court stated in Barufaldi, id. at 393, 75 A.3d at 959, "[t]he private right of action under the statute was [] designed as a vehicle for employees to collect, and an incentive for employers to pay, back wages[,]" and it was "designed to ensure that an employee will have the assistance of competent counsel in pursuing what is likely to be a relatively small claim." (Cleaned up). See also Cunningham v. Feinberg, 441 Md. 310, 323, 107 A.3d 1194, 1202 (2015) ("After the elimination of the

unit within the office of the Commissioner of Labor and Industry responsible for prosecuting such civil actions, the General Assembly added a private right of action to provide a meaningful remedy to the harm flowing from the refusal of employers to pay wages lawfully due." (Cleaned up)).

One of the most recent amendments to the MWPCL—House Bill 136—prohibits employers from taking or threatening to take adverse action against employees who take certain actions, such as asserting their rights, under the Maryland Wage Laws, among others. See Fiscal and Policy Note (Revised), at 1, H.B. 136, 2024 Gen. Assemb., Reg. Sess. (Md. 2024), available at https://mgaleg.maryland.gov/2024RS/fnotes/bil_0006/ hb0136.pdf [https://perma.cc/7BRM-ZPAT]. Describing the then-current state of the MWPCL, the revised Fiscal and Policy Note stated:

> The [MWPCL] requires employers to pay workers the wage promised; establish regular paydays; pay wages when due; pay employees in a specified manner; pay employees at least once every two weeks or twice in each month, with exceptions; furnish employees with a statement of gross earnings; advise employees of their rate of pay and designated payday; and pay employees all wages due on termination of employment. [The MWPCL] does not have any anti-retaliation protections for employees.

Id. at 4. The above list of what the MWPCL requires is completely focused on the rights of an employee to be paid—paid fully, paid regularly, and paid on time. The anti-retaliation law the General Assembly enacted "encourage[s] employees to exercise their rights" under the employment laws. Id. at 6. Strengthening an employees' ability to recover unpaid wages without fear of reprisal advances both purposes—for workers to be fully

compensated and treated fairly.[2]

In 2011, the General Assembly added an anti-waiver provision to the MWPCL, protecting employees from agreements with employers to work for a pay rate that is less than the wage required by law. See 2011 Md. Laws 592, 594 (Ch. 118, H.B. 298); Fiscal and Policy Note, at 1, H.B. 298, 2011 Gen. Assemb., Reg. Sess. (Md. 2011), available at https://mgaleg.maryland.gov/2011rs/fnotes/bil_0008/hb0298.pdf [https://perma.cc/LY3N -C7BL]. In discussing that amendment ten years ago, this Court "encourage[d] a future Maryland Court to hold . . . that the MWPCL represents strong Maryland public policy" that "the protections afforded the timely payment of wages owed are quite important[.]" Cunningham, 441 Md. at 344, 107 A.3d at 1215. We explained that "[t]he anti-waiver provision and other clear indicators of legislative intent point to such a conclusion." Id. at 344, 107 A.3d at 1215.

Critically, it is not just recent amendments that demonstrate the General Assembly's focus on treating workers fairly and ensuring employees are paid for all work performed under the Maryland Wage Laws. More than thirty years after the Supreme Court decided Anderson and 29 C.F.R. § 785.47 had been published, as explained above, the General

---

[2]House Bill 136 also amended the MWHL, which already contained an anti-retaliation provision. As the revised Fiscal and Policy Note stated, House Bill 136 created new anti-retaliation provisions for the MWPCL and certain other employment laws "and/or strengthen[ed] existing anti-retaliation provisions and enforcement within other laws[,]" such as the MWHL. Fiscal and Policy Note (Revised), at 1, 4. As a result of House Bill 136, LE § 3-105 was enacted. The statute applies to, among other laws, the MWHL and the MWPCL, and prohibits an employer from taking adverse action against an employee who, among other things, makes a complaint regarding a violation of the Maryland Wage Laws. See LE § 3-105(a)(3), (a)(4), (b)(1).

Assembly amended the MWPCL to address crippling budget cuts to the Commissioner of Labor and Industry's office that made enforcement of the Maryland Wage Laws difficult. See Friolo, 373 Md. at 516, 819 A.2d at 363. We discussed the legislative history of the 1993 amendment in Friolo, id. at 516-17, 819 A.2d at 363-64, which demonstrated that the claims filed with the Division often involved between $150 and $200, and proponents of the bill amending the MWPCL to include treble damages and the ability to award counsel fees recognized that employees "often had no other resource available to assist them in pursuing their claims[.]" Rather than being concerned with the relatively small value of the claims, the General Assembly *sought to address* the difficulties with pursuing such small claims by adding incentives to pursuing them.

The history of the FLSA and 29 C.F.R. § 785.47 compared to the Maryland Wage Laws, and in particular the 1993 amendment, could not be more opposite. 29 C.F.R. § 785.47 was promulgated to limit the flood of federal claims brought after Anderson and the significant potential liability to employers, while the 1993 amendment to the MWPCL sought to encourage claims brought under the Maryland Wage Laws, *particularly* the relatively small ones. Any argument that the General Assembly intended to incorporate the federal *de minimis* doctrine or a common law *de minimis* principle in the Maryland Wage Laws, and yet chose to amend the MWPCL in 1993 as it did to facilitate small claims, does not make sense. The 1993 amendment is irreconcilable with both the federal doctrine and any alleged *de minimis* "background principle" in Maryland being applicable to the Maryland Wage Laws. The Maryland Wage Laws should not be construed in a manner that is antithetical to the General Assembly's purpose in enacting and amending the laws.

**Maryland Case Law**

In <u>Gephart v. Strong</u>, 20 Md. 522, 525 (1864), this Court held that the "maxim *de minimis non curat lex*, cannot prevail against an express statutory provision." (Cleaned up). <u>Gephart</u> concerned an appeal from the Orphans' Court of Allegany County in which the Orphans' Court ordered executors of an estate to return sixty-four dollars of a premium, or a fee, that the executors had collected when they sold gold coins as part of a sale of the estate. See <u>id.</u> at 522. Heirs of the estate, who were entitled to two-eighths of the estate, sued the executors, arguing that the premium was part of the estate and, as the executors had already charged for their service, the premium should be returned to the estate. See <u>id.</u> at 523. The Orphans' Court ordered the executors to return the premium and the executors appealed. See <u>id.</u> at 522-23. In this Court, the heirs, who would be entitled to sixteen dollars of the returned premium, argued that the case should be dismissed because the sum was so small that the Court "ought not to entertain jurisdiction" of it, under the principle of *de minimis non curat lex*. <u>Id.</u>

The heirs cited Md. Code, Art. 5, § 39, which stated: "In all decrees, orders, decisions and judgments, made by the Orphans' Court, the party who may deem himself aggrieved by such decree, order, decision or judgment, may appeal to the Court of Appeals[.]" <u>Id.</u> at 525. As stated above, this Court concluded that "[t]he maxim '*de minimis non curat lex,*' cannot prevail against an express statutory provision[,]" thus any amount at issue could support an appeal following a decree, order, decision, or judgment made by the Orphans' Court. <u>Id.</u> Ultimately, we affirmed the Orphans' Court order, concluding that the executors had improperly obtained a profit over and above their

commission that must be returned to the estate.  See id. at 527.

In Amaya, 479 Md. at 522, 525-26, 278 A.3d at 1220, 1222, a recent case concerning whether construction workers were owed unpaid and overtime wages for the time they waited and traveled between a parking area and the construction site where they labored, totaling approximately two hours per day, this Court held that the PPA, an amendment to the FLSA, had not been incorporated into Maryland law and "what constitutes 'work' under Maryland law is not limited to what is compensable work under the PPA and FLSA."

We looked first to the language of the Maryland Wage Laws, determining that there is no reference or mention of the PPA in either the MWHL or the MWPCL, much less an explicit adoption of the PPA.  See id. at 556, 278 A.3d at 1240.  We noted that the MWHL defines "Federal Act" to mean "the federal Fair Labor Standards Act of 1938."  Id. at 556-57, 278 A.3d at 1240 (quoting LE § 3-401(c)) (footnote omitted).  We explained the definition's importance, as it draws a distinction between the FLSA as enacted and the FLSA as amended by the PPA—the PPA was enacted nearly twenty years before the MWHL and we stated that the General Assembly knows how to demonstrate its desire to incorporate a federal law into a Maryland statute when it defines a term or refers to other statutes.  See id. at 557, 278 A.3d at 1241.  For these reasons, we concluded that the PPA had not been adopted as Maryland law.  See id. at 557, 278 A.3d at 1241.

Although we concluded that the plain language of the MWHL and the MWPCL (and COMAR) are clear, we also examined the legislative history of the Maryland Wage Laws.  See id. at 559, 278 A.3d at 1242.  We concluded that the legislative history of the Maryland Wage Laws was silent as to the PPA, as the PPA was not included either at the

laws' enactments or through their amendments over the decades. See id. at 559, 278 A.3d at 1242. In declining to hold that the Maryland Wage Laws "silently or implicitly incorporate[ed] the PPA[,]" we explained that to do so would "undermine our process of statutory construction," in that "we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." Id. at 559-60, 278 A.3d at 1242 (citation omitted). We concluded that "[t]he purpose and language of the MWHL are different from that of the PPA" and

> [t]he General Assembly's omission of any mention of the PPA speaks for itself and means that the PPA is not part of Maryland law. To conclude differently would be to require the General Assembly expressly disavow the adoption or incorporation of federal laws or run the risk of being deemed to have incorporated the law in Maryland.

Id. at 560, 278 A.3d at 1243.

After holding that the PPA had not been adopted or incorporated into the MWHL, the MWPCL, or COMAR, we remanded the cases to the Appellate Court with instructions to remand the cases to the trial court for findings by the trier of fact which would determine whether the workers were entitled to compensation under Maryland law. See id. at 526, 278 A.3d at 1222.

We discussed the MWHL and the MWPCL at length in Friolo, 373 Md. at 504-05, 513-18, 819 A.2d at 356, 361-64, a case concerning the proper method for calculating counsel fees under the Maryland Wage Laws. We began with an analysis of the MWHL, observing that the MWHL, though it allows individual enforcement, also allows the Commissioner to take assignment of an individual claim in trust for an employee and to

- 22 -

ask the Attorney General to file the action on the employee's behalf, "[r]ecognizing that many of these claims may be small ones and that employees may be unfamiliar with how to file and prosecute a lawsuit[.]" Id. at 513, 819 A.2d at 361. Turning to the MWPCL, we stated that the law "does not concern the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of employment." Id. at 513, 819 A.2d at 362. We noted that the MWPCL also allows for individual enforcement, as well as an award of treble damages under LE § 3-507.1 (now codified at LE § 3-507.2). See id. at 514, 819 A.2d at 362. We also noted that LE § 3-507.1 was added to the MWPCL in 1993. See id. at 516, 819 A.2d at 363; see also 1993 Md. Laws 2868 (Ch. 578, H.B. 1006).

We discussed the circumstances that led to the 1993 amendment of the MWPCL. See Friolo, 373 Md. at 516, 819 A.2d at 363. As originally enacted, the MWPCL allowed the Commissioner to file suit on behalf of employees to collect unlawfully withheld wages, but the law did not provide a statutory action for the employee. See id. at 515-16, 819 A.2d at 363. We explained that, over time, the law was amended to provide for civil penalties up to 10%, then 20%, of the wages due, and then, in 1983, the MWPCL was amended to allow a court, when the action was brought by the Commissioner, to award three times the amount of the withheld wages in damages if the court found the employer was not withholding the money as a result of a bona fide dispute. See id. at 516, 819 A.2d at 363. In 1983, the statute did not mention counsel fees. See id. at 516, 819 A.2d at 363.

We explained that LE § 3-507.1 was added in 1993 to allow employees to file their own actions under the MWPCL, as enforcement of the law was "crippl[ed]" by budget cuts

- 23 -

to the Commissioner's office.  Id. at 516, 819 A.2d at 363.[3]  We then discussed the legislative history of the 1993 amendment.  See id. at 516, 819 A.2d at 363.  We noted that the Executive Director of the Maryland Volunteer Lawyers Service reported that the majority of claims filed with the Division of Labor and Industry were filed on behalf of low-income people and involved between $150 to $200.  See id. at 517, 819 A.2d at 363.  We also stated that proponents of the amendment supported the treble damage and counsel fee provisions for individuals because they recognized that these "employees often had no other resource available to assist them in pursuing their claims[.]"  Id. at 517, 819 A.2d at 363-64.  Ultimately, we concluded that the amendment strengthened the MWPCL in permitting an individual to file a claim and in allowing the court to award treble damages and counsel fees.  See id. at 518, 819 A.2d at 364.

**Other Jurisdictions**

In In re Amazon.com, Inc., 255 A.3d 191, 192-93 (Pa. 2021), a case identical in the basic facts to the one before this Court, the Supreme Court of Pennsylvania, answering two certified questions from the United States Court of Appeals for the Sixth Circuit, held that "time spent on an employer's premises waiting to undergo, and undergoing, mandatory security screening constitutes 'hours worked' under the [Pennsylvania Minimum Wage Act ("PMWA")]; and there exists no *de minimis* exception to the PMWA."  In considering whether the time spent on an employer's premises waiting to undergo and undergoing

---

[3]The MWHL, at that time, already permitted employees to file their own actions, so the 1993 amendment did not address the MWHL.  See Friolo, 373 Md. at 516, 819 A.2d at 363.

- 24 -

mandatory security screenings constituted work under the PMWA, the Supreme Court of Pennsylvania did not find <u>Busk</u> persuasive, due to the Supreme Court of the United States resting its interpretation on the PPA, which the Court declined to judicially engraft as part of the PMWA. See <u>id.</u> at 201-02. The Court concluded that the PMWA "must be interpreted in accordance with its own specific terms[.]" <u>Id.</u> at 202. The Court held that, under the PMWA, time spent undergoing or waiting to undergo the mandatory security screening was compensable time. See <u>id.</u> at 204.

The Court held that Pennsylvania does not recognize a *de minimis* exception to claims under the PMWA. See <u>id.</u> at 208-09. The Court analyzed <u>Anderson</u>, 29 C.F.R. § 785.47, and <u>Sandifer</u>, concluding that even the relevance of the *de minimis* doctrine in the interpretation of the FLSA "is no longer certain." <u>Id.</u> at 205-08. Noting that in <u>Sandifer</u> the Supreme Court of the United States declined to apply the *de minimis* doctrine, the Supreme Court of Pennsylvania stated that the decision in <u>Sandifer</u>, as well as the "restrictive formulation" of the DOL's regulation, "indicates, at the very least, that the precise contours of [the *de minimis* doctrine] remain in flux with respect to the FLSA, and, thus, it is not a clear principle which readily lends itself to interpretation of a unique statutory enactment such as the PMWA." <u>Id.</u> at 208.

In addition to concluding that the federal application of the *de minimis* doctrine remained unclear, the Court stated that the *de minimis* doctrine has never been used by the Court in interpreting the PMWA. See <u>id.</u> The Court observed that while the "ancient equitable maxim *de minimis non curat lex*" had been used in statutory interpretation under certain circumstances, it had only done so when the doctrine was consistent with a statute's

legislative purpose.  Id.  The Court stated that the PMWA's purpose in maintaining the economic well-being of the state's workforce by ensuring that all workers are paid for all of the time they are required to expend indicates no intent of the Pennsylvania General Assembly to allow the application of the *de minimis* doctrine, and as the plain and unambiguous language of the statute indicates, workers must be paid for "all hours worked," signifying that *any* portion of the hours worked do not constitute a mere trifle. Id. at 208-09.  Accordingly, the Court answered the Sixth Circuit, holding that there is not a *de minimis* exception to the PMWA.  See id. at 209.[4]

---

[4]Considering the same basic facts as those found here and in In re Amazon.com, Inc., the United States District Court for the District of New Jersey, in an unreported opinion in Vaccaro v. Amazon.com.dedc, LLC, Civil Action No. 18-11852 (GC) (TJB), 2024 WL 4615762, at \*19 (D.N.J. Oct. 30, 2024), stated that it was disinclined to hold that New Jersey's common law *de minimis* doctrine or the FLSA *de minimis* "exception" applied to the New Jersey Wage and Hour Law ("NJWHL") because the doctrine was inconsistent with the plain language of the NJWHL and its regulations, had never been applied to the NJWHL by a New Jersey court, and the FLSA exception was not explicitly incorporated into the NJWHL, even though the NJWHL was enacted after Anderson and 29 C.F.R. § 785.47.

The District Court first noted that the NJWHL requires employers to pay their employees "for all hours worked."  Id. at \*18 (citing N.J. Admin. Code § 12:56-5.1).  In addition, the District Court stated that the purpose of the NJWHL was to protect employees from unfair wages and excessive hours, and, citing an opinion from the Supreme Court of New Jersey, concluded that "courts should not ignore provisions of the NJWHL's implementing regulations that provide broader protections than the FLSA because the NJWHL was passed 'to protect workers not covered by [the] FLSA.'"  Id. (quoting Hargrove v. Sleepy's, LLC, 106 A.3d 449, 463 (N.J. 2015)) (alteration in original).

The District Court concluded that it was not convinced that the plain meaning of the NJWHL's language could be interpreted to include the *de minimis* exception of the FLSA, and that the legislature's and New Jersey Commissioner of Labor's non-incorporation of the exception, even after the Anderson decision and the issuance of 29 C.F.R. § 785.47, was intentional because the legislature and Commissioner had expressly referred to other provisions of the FLSA in the NJWHL and its regulations.  See id. at \*19.

In Troester v. Starbucks Corp., 421 P.3d 1114, 1116, 1121 (Cal. 2018), a case in which the United States Court of Appeals for the Ninth Circuit certified a question to the Supreme Court of California regarding whether the federal *de minimis* doctrine applied to claims for unpaid wages under the California Labor Code, the Court held that it would not presume that the Industrial Welfare Commission ("IWC") "intended to incorporate a less protective federal rule without evidence of such intent," which the Court saw no sign of in the text or history of the Labor Code or IWC wage orders.[5]

The Court explained that it construes the Labor Code and wage orders in a way that best gives effect to the purpose of the Legislature and IWC, which the Court concluded is the protection of employees, particularly when considering working conditions, wages, and hours. See id. at 1119. The Court looked to Wage Order No. 5, which defined "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so[.]" Id. In addition, the Court noted that Wage Order No. 5 specifies that wages must be paid to employees "for all hours worked." Id. at 1119-20. The Court

---

The District Court did not take up Amazon's argument that New Jersey's *de minimis* common law doctrine should be applied because it is a "well-established background principle" and it was unnecessary for the legislature to expressly adopt it because the doctrine exists at common law. See id. The District Court concluded that no New Jersey court had ever applied the common law *de minimis* doctrine to the NJWHL, that it was unaware of any authority foreshadowing its application to the NJWHL, and that the doctrine is inconsistent with the plain language of the statute and regulations. See id. Accordingly, the District Court declined to hold that the Supreme Court of New Jersey would apply the *de minimis* doctrine to the NJWHL and denied Amazon's motion for summary judgement on that basis. See id. at *20.

[5]Wage orders are legislative regulations that take precedence over the common law in California. See Troester, 421 P.3d at 1119.

concluded that a federal rule that permits employers in some circumstances to require employees to work up to ten minutes a day without compensation is less protective than California's Labor Code and wage orders. See id. at 1120. The Court stated that nothing in the language of either the Labor Code or wage orders showed an intent to incorporate the *de minimis* exception, and neither the Labor Code nor wage orders have been amended to include it, even though Anderson was published decades prior. See id.

The Court also addressed Starbucks' argument that even if the Labor Code and wage order had not explicitly adopted the *de minimis* exception, the *de minimis* principle is part of the "established background of legal principles against which the statutes and wage order have been enacted." Id. at 1121 (cleaned up). Rather than decide whether the *de minimis* principle, which the Court acknowledges is a "maxim[] of equity" that may be applied under certain circumstances, may ever apply to wage and hour claims, the Court only decided whether the principle applied in the case before it. Id. at 1121-22. The Court concluded that the *de minimis* principle did not apply to the up-to ten minutes of time it took for the Starbucks employee to complete store closing duties. See id. at 1122, 1125. As the Court stated, "a few extra minutes of work each day can add up. . . . What Starbucks calls 'de minimis' is not de minimis at all to many ordinary people who work for hourly wages." Id. at 1125.

Like the Supreme Courts of Pennsylvania and California, based on the principles above, I would hold that the federal *de minimis* doctrine has not been adopted or incorporated into either the MWHL or the MWPCL. After determining that "there are persons employed in some occupations in the State of Maryland at wages insufficient to

provide adequate maintenance and to protect health[,]" 1965 Md. Laws 966; see also LE § 3-402(a), the General Assembly enacted the MWHL, and a year later the MWPCL, with the purpose of establishing a wage and hour law fixing minimum wages for employees and requirements with respect to the regularity, frequency, and medium of wage payments and ensuring that workers are paid for all hours worked. This purpose and the legislative history of the Maryland Wage Laws demonstrate no intent on the part of the General Assembly to permit application of the *de minimis* doctrine, or to declare any portion of time worked to be a mere trifle for which employees should not be paid.

### The Federal *de minimis* Doctrine: Unclear and Incompatible with the Maryland Wage Laws

In Busk, 574 U.S. at 29, the Supreme Court answered the question as to whether waiting to undergo or undergoing security screenings in an Amazon warehouse was compensable under the FLSA, as amended by the PPA. The Supreme Court concluded, under the PPA, that such activities were noncompensable postliminary activities because they were not integral and indispensable to the work the employees were hired to perform—namely the retrieval and packaging of products for shipment to Amazon customers. See id. at 35, 37.

In this case, however, Ms. Martinez filed her claims under the Maryland Wage Laws. As we have already held that the PPA has not been incorporated into Maryland law, see Amaya, 479 Md. at 557, 278 A.3d at 1241, any argument in that vein would be ineffective. As such, Amazon contends that the federal *de minimis* doctrine has been incorporated into Maryland law.

In the same year that the Supreme Court decided <u>Busk</u>, the Supreme Court examined, but declined to apply, the *de minimis* doctrine in <u>Sandifer</u>, 571 U.S. at 234. The Supreme Court expressed that judges should not be turned into "time-study professionals" in "select[ing] among trifles[.]" <u>Id.</u> The Supreme Court concluded that the *de minimis* rule did not "fit comfortably within the statute at issue" because "in the context of the present case, there [was] no more reason to *disregard* the minute or so necessary to put on glasses, earplugs, and respirators, than there [was] to *regard* the minute or so necessary to put on a snood." <u>Id.</u> (emphasis in original). Though seemingly limited to circumstances where the parties have a collective-bargaining agreement that would require a court to consider whether certain pieces of protective gear are "clothing" and characterize the time spent donning and doffing protective gear as time either spent putting on clothes or putting on gear that is not clothing, the Supreme Court's declination to apply the *de minimis* doctrine that Amazon has characterized as a "settled" doctrine calls into question its use even with respect to the FLSA.

I agree with the Supreme Court of Pennsylvania that "the relevance of the *de minimis* doctrine in the interpretation of the federal FLSA going forward is no longer certain" after <u>Sandifer</u>. <u>In re Amazon.com</u>, 255 A.3d at 208. In <u>In re Amazon.com</u>, <u>id.</u>, the Supreme Court of Pennsylvania stated that <u>Sandifer</u> and "the restrictive formulation of the doctrine" in 29 C.F.R. § 785.47 indicate "that the precise contours of [the *de minimis* doctrine] remain in flux with respect to the FLSA, and, thus, it is not a clear principle which readily lends itself to interpretation of a unique statutory enactment such as the PMWA." Based on the federal case law concerning the FLSA and the federal *de minimis* doctrine as

described in 29 C.F.R. § 785.47, it is clear that in some instances, like Sandifer, under federal law, the doctrine's use is inappropriate. Under what circumstances it would be appropriate to apply the *de minimis* doctrine under the FSLA is unclear. What is clear is that the federal regulation governing the doctrine's application cites case law holding that ascertainable working time amounting to even $1 of additional compensation per week, or ten minutes per day, is not trivial or *de minimis*. With the background of a less-than-clear application of the doctrine in the federal context, it would be impossible to conclude that the federal *de minimis* doctrine has been adopted or incorporated into either the MWHL or MWPCL.

Amazon argues that because the Maryland Wage Laws expressly reference the FLSA, the General Assembly incorporated the "federal backdrop[,]" including the *de minimis* doctrine. I disagree. As we made clear in Amaya, 479 Md. at 560, 278 A.3d at 1242-43, when considering whether the PPA had been silently or implicitly incorporated into Maryland's Wage Laws,

> [t]he General Assembly's omission of any mention of the PPA speaks for itself and means that the PPA is not part of Maryland law. To conclude differently would be to require that the General Assembly expressly disavow the adoption or incorporation of federal laws or run the risk of being deemed to have incorporated the law in Maryland.

Amazon, however, argues that because we construed the PPA, not the FLSA, in Amaya, Amaya's conclusions do not foreclose its argument, namely because we did not "disturb" the Appellate Court of Maryland's decision in Poe v. IESI MD Corp., 243 Md. App. 243, 220 A.3d 333 (2019)—that federal law is "persuasive authority as to the correct interpretation of Maryland law." (Cleaned up). But, as we concluded in Amaya, 479 Md.

- 31 -

at 562, 278 A.3d at 1244, "Poe stands for the proposition that, under certain circumstances, where the relevant statutory provisions of the MWHL mirror those of the FLSA, Maryland law does not necessarily prohibit an employer from relying on a federal regulation to calculate overtime compensation for day-rate employees." Critical to that conclusion was the fact that the provisions in the FLSA and MWHL at issue in Poe were substantially similar. See Amaya, 479 Md. at 562, 278 A.3d at 1244. Here, the Maryland Wage Laws are completely silent as to the *de minimis* doctrine and the *de minimis* doctrine is inconsistent with the purpose of the Maryland Wage Laws that employees be compensated for all hours worked.

Amazon also argues that because the Maryland Wage Laws and the FLSA are substantially similar *generally*, Ms. Martinez's reliance on Amaya is misplaced. Amazon draws attention to the similarities in the definitions of "employer," similar purposes of the laws, and the fact that the MWHL expressly refers to the FLSA for additional support.

To be sure, we have stated that the FLSA and the Maryland Wage Laws share similarities and that the MWHL is the "State parallel" to the FLSA, see Friolo, 373 Md. at 513, 819 A.2d at 361, but the Maryland Wage Laws do not mirror the FLSA's acceptance of the *de minimis* doctrine. Amazon is correct that the General Assembly adopted certain provisions of the FLSA into the MWHL. As we pointed out in Amaya, 479 Md. at 558, 278 A.3d at 1241, COMAR regulations related to the MWHL expressly incorporated some definitions from federal labor regulations.[6] But such references should not convince this

---

[6]In Amaya, 479 Md. at 558, 278 A.3d at 1241, we gave the following examples:

Court to hold that the *de minimis* doctrine was adopted or incorporated as part of Maryland law in the absence of any mention or reference to 29 C.F.R. § 785.47, the *de minimis* doctrine in general, or any reference to the federal case law concerning the doctrine, in either the Maryland Wage Laws or the corresponding regulations. In keeping with Amaya, 479 Md. at 557-58, 278 A.3d at 1241-42, in which this Court held that referencing the FLSA did not indicate the General Assembly's intent to incorporate the PPA into the Maryland Wage Laws, I would hold that references to the FSLA here do not indicate the General Assembly's intent to incorporate federal common law principles or a federal regulation concerning the *de minimis* doctrine into the law either.

My perspective aligns with other state Supreme Courts that have rejected the suggested incorporation of the federal *de minimis* doctrine in their state wage laws. Just as the Supreme Court of Pennsylvania stated in In re Amazon.com, 255 A.3d at 208-09, that the *de minimis* doctrine had never been applied to the Pennsylvania wage law, undisputedly, such an absence in Maryland precedent exists as well. The purposes of the Pennsylvania and Maryland wage laws are comparable—both were enacted to protect the well-being and health of the workforce in each State. See LE § 3-402(a); In re

COMAR 09.12.41.01 (providing that "administrative capacity" "has the meaning stated in 29 CFR § 541.200 et seq."); COMAR 09.12.41.04 (providing that "directly and closely related" "has the meaning stated in 29 CFR § 541.703 et seq."); COMAR 09.12.41.05 (providing that "executive capacity" "has the meaning stated in 29 CFR § 541.100 et seq."); COMAR 09.12.41.13 (providing that "outside salesman" "has the meaning stated in 29 CFR § 541.500 et seq."); COMAR 0.12.41.17 (providing that "professional capacity" "has the meaning stated in 29 CFR § 541.300 et seq.").

- 33 -

Amazon.com, 255 A.3d at 208-09.  The Supreme Court of Pennsylvania's explanation that the Pennsylvania statute's plain and unambiguous language that workers must be paid for "all hours worked" means that *any* portion of the hours worked do not constitute a trifle is persuasive, In re Amazon.com, 255 A.3d at 209, and applies to the Maryland Wage Laws' requirement that employees be paid "all compensation that is due[,]" LE §§ 3-401(d), 3-501(c)(1).

In addition, the Supreme Court of California's logic in Troester, 421 P.3d 1114, is persuasive.  In Troester, 421 P.3d at 1121-22, 1125, even though the Supreme Court of California considered whether the "maxim[] of equity" *de minimis* principle applied to the specific circumstances at issue, the Court declined to apply it to the "few extra minutes of work" the Starbucks employee took to complete store closing duties, noting that what may be *de minimis* to some may not be to individuals who work for hourly wages.[7]

### Alleged Maryland Common Law *de minimis* "Background Principle"

Amazon contends that Maryland has a *de minimis* "background principle" that applies to all statutes absent a contrary indication from the General Assembly.  Mere mention of the *de minimis* doctrine in Maryland case law cannot reasonably be said to create a principle that applies to all Maryland statutes, nor should such a mention permit

---

[7]The United States District Court for the District of New Jersey's logic in Vaccaro, 2024 WL 4615762, is also persuasive.  In Vaccaro, 2024 WL 4615762, at *19, the District Court was "disinclined" to hold that New Jersey's common law *de minimis* doctrine or the federal equivalent applied to the NJWHL because the doctrine was inconsistent with the law's plain language, the doctrine had never been applied to the wage law by a New Jersey court, and the federal doctrine had not been incorporated in the law.  All of the same circumstances exist in Maryland as well.

- 34 -

courts to read into statutes language or intent that is not there. Moreover, the cases that Amazon cites as evidence of the existence of a *de minimis* doctrine "background principle" in Maryland are not, in my view, what Amazon says.

At the risk of stating the obvious, this Court has never applied a common law *de minimis* principle in any dispute involving the Maryland Wage Laws. But, in advancing an argument that the doctrine is a background principle that applies to every Maryland statute, Amazon relies mainly on three Maryland cases. Amazon cites In re Tyrell A., 442 Md. 354, 112 A.3d 468 (2015), for the proposition that "[t]he General Assembly legislates against the backdrop of certain unexpressed presumptions." (Cleaned up). Amazon also discusses two of this Court's opinions in which the *de minimis* doctrine has been discussed, arguing that therefore the doctrine is established in Maryland's common law: Cap. Transit Co. v. Bosley, 191 Md. 502, 62 A.2d 267 (1948), and Bd. of Trs. of Emps.' Ret. Sys. of City of Balt. v. Mayor & City Council of Balt., 317 Md. 72, 562 A.2d 720 (1989). For the reasons stated below, this case law is not persuasive.

In Tyrell A., 442 Md. at 358-59, 112 A.3d at 470-71, this Court considered whether restitution was appropriate in a case involving two juveniles who engaged in a mutual fistfight. Petitioner argued that the other juvenile who engaged in the fight with Petitioner was a co-participant and not a "victim" entitled to restitution. See id. at 360, 112 A.3d at 471. In determining whether a voluntary co-participant in a crime or delinquent act may be considered a "victim," we stated that the General Assembly "legislates . . . against 'the backdrop of certain unexpressed presumptions[.]'" Id. at 363-64, 112 A.3d at 473-74 (citation omitted). The "unexpressed presumption" against which the General Assembly

- 35 -

was said to have legislated in <u>Tyrell A.</u> was the presumption that voluntary participants in a criminal activity may be harmed as a direct result of their participation.  <u>See id.</u> at 363, 112 A.3d at 473.  In other words, this "unexpressed presumption," as it is described in <u>Tyrell A.</u>, could be characterized as an obvious potential consequence of a delinquent act.  Our holding in <u>Tyrell A.</u> in no way supports the proposition that a *de minimis* doctrine is a background principle in Maryland that, as Amazon contends, may be applicable to any statute, including the Maryland Wage Laws.  <u>Tyrell A.</u> does not mention the *de minimis* doctrine at all.

In <u>Bosley</u>, 191 Md. at 505, 508, 513-14, 62 A.2d at 269, 270, 273, this Court considered an order of the Public Service Commission allowing a corporation that operated a public passenger transportation system to raise its fares, provided that the corporation decreased the fare charged for school children.  The Commission required the corporation to maintain the existing fare prices until the fare for school children was decreased, per the Commission's order.  <u>See id.</u> at 510-11, 62 A.2d at 271.  The new fare rate would still result in a total annual loss of $178,000 for the corporation.  <u>See id.</u> at 511, 62 A.2d at 271.

When the corporation challenged the order, the Commission argued that the loss from lowering the fare rate for school children totaled $2,268 and was within "the doctrine de minimis."  <u>Id.</u> at 513-14, 62 A.2d at 273.  Although stating that "the doctrine de minimis is applicable in rate cases as in other cases[,]" we concluded that it was unnecessary to decide whether the $2,268 loss was *de minimis* in addition to the $178,000 loss the corporation would experience under the Commission's order.  <u>Id.</u> at 514, 62 A.2d at 273.  We held that the order, which would compel the corporation to transport school children

without the State paying for the service, effectively constituted an unconstitutional taking, and we reversed the trial court's dismissal of the bill to set aside the Commission's order. See id. at 514-15, 62 A.2d at 273. In sum, in Bosley, the Court mentioned the *de minimis* doctrine only in *dicta* and in no way indicated that it is a background principle that applies to all Maryland statutes, let alone the Maryland Wage Laws.

In Bd. of Trs. of Emps.' Ret. Sys. of City of Balt., 317 Md. at 79, 109-110, 562 A.2d at 723, 738, a case concerning two Baltimore City ordinances requiring the City employee pension systems to divest holdings in companies doing business in South Africa, this Court held that a trustee does not ordinarily transgress a duty of loyalty and prudence in considering the social consequences of investment decisions when the costs of making changes are *de minimis*. We recognized that the cost of divestiture may be large in absolute terms, but the costs are deemed *de minimis* when compared to the systems' total assets. See id. at 108 n.36, 562 A.2d at 737 n.36. We did not discuss a *de minimis* doctrine or its application to any Maryland statute.

None of the cases discussed above establishes that the *de minimis* doctrine is a background principle in Maryland case law or common law that requires an explicit denouncement from the General Assembly or else it is incorporated into every Maryland statute. Contrary to Amazon's argument that this Court's statement that "the doctrine de minimis is applicable in rate cases *as in other cases*[,]" see Bosley, 191 Md. at 514, 62 A.2d at 273 (emphasis added), shows a clear intent that the doctrine is comprehensively applicable, the language is plainly *dicta* and, read in context, at most referred to amounts of monetary loss being able to be considered *de minimis* in rate cases and other cases. To

be sure, the words "*de minimis*" were used in <u>Bosley</u> and <u>Bd. of Trs. of Emps.' Ret. Sys. of City of Balt.</u>, but neither this Court nor the General Assembly has ever announced that a *de minimis* doctrine is a "background principle" in Maryland common law or statutes, respectively. Contrary to Amazon's contention, I would hold that there is no background *de minimis* principle that applies to all Maryland statutes and that any common law *de minimis* principle that may exist in Maryland cannot prevail over unambiguous statutory language and legislative history.

The Majority's holding in this case that "the de minimis doctrine applies to claims brought under the Maryland Wage Laws[,]" Maj. Slip Op. at 32, in effect, will chill employees from bringing claims that the General Assembly amended the MWPCL in 1993 to encourage. Individual employees with small, unique claims that, contrary to the General Assembly's intent, employers will now contend are *de minimis*, will suffer the impact of this holding the most.[8]

---

[8]The Majority rests its holding almost entirely on the reasoning that, because <u>Anderson</u> had been decided before the MWHL and some federal courts applied the FLSA's *de minimis* principle, it can be presumed that the General Assembly was aware of <u>Anderson</u> and its recognition of the applicability of the *de minimis* doctrine under the FLSA and that the General Assembly therefore intended to incorporate the doctrine into the MWHL. <u>See</u> Maj. Slip Op. at 25-26. The Supreme Court of the United States, however, decided <u>Anderson</u> on grounds other than applying the *de minimus* doctrine. In <u>Anderson</u>, 328 U.S. at 690-92, after issuing its holding that the time employees spent walking to their working places and performing preliminary duties constituted work time that must be compensated under the FLSA, the Supreme Court stated that it did not preclude application of a *de minimus* doctrine "where the minimum walking time is such as to be negligible." The existence of a doctrine, discussed in a Supreme Court case or described in a federal regulation, that the General Assembly did not mention at any time in the process of enacting the Maryland Wage Laws is not evidence of an intent by the General Assembly to incorporate the unmentioned doctrine into the wage laws. Yet, the Majority states that,

The Majority's observation that "[h]ow a trier of fact should determine whether a particular amount of time worked is or is not de minimis under the Maryland Wage Laws remains to be seen[,]" Maj. Slip Op. at 32 n.13, *i.e.*, a statement that appears to conclude that Ms. Martinez's claim is not *per se* foreclosed by its holding, does not abrogate the harm it will cause. While this Court may not be tasked with deciding whether Ms. Martinez and the other 23,913 current and former Amazon employees in Maryland subjected to security screenings may be compensated for their time, the Majority has declared that some amount of time Maryland workers spend under the control of an employer may not be worthy of compensation. In my view, such an interpretation of the Maryland Wage Laws is in direct contradiction to the General Assembly's clear intent that employees be compensated for all work performed.

I would answer the certified question from the United States District Court for the District of Maryland as follows. Based on the plain language and legislative history of the statutes, it is clear that the federal *de minimis* doctrine has not been adopted or incorporated into either the MWHL or the MWPCL. There is no background or common law *de minimis* principle in Maryland that applies to all Maryland statutes unless disavowed by the General Assembly. And, any alleged background *de minimis* principle could not prevail over the

---

"had the General Assembly not intended a de minimis rule to apply to the MWHL's provisions concerning the compensability of work (and to the MWPCL when it enacted that law a year later), we believe it would have said so." Maj. Slip Op. at 27 (footnote omitted). The Majority's holding will require the General Assembly to affirmatively disavow any concept or doctrine that is applicable under the FLSA or else a majority of this Court will hold that the General Assembly can be presumed, through silence, to have been aware of the doctrine and have incorporated it into the Maryland Wage Laws.

unambiguous language of the MWPCL and the MWHL and the legislative history of the statutes, which demonstrate an intent by the General Assembly that employees be compensated for all time worked.

For the above reasons, respectfully, I dissent.

Justice Eaves has authorized me to state that she joins this dissent.